MARLIN *v.* LEWALLEN ET AL.

CERTIORARI TO THE SUPREME COURT OF OKLAHOMA.

No. 40. Argued October 18, 1927.—Decided February 20, 1928.

1. The surviving husband of a woman of the Creek blood and tribe, whether himself of that blood or not, has no estate of curtesy in land allotted and patented to her in the distribution of the tribal property under the original and supplemental Creek Agreements, Acts of March 1, 1901, and June 30, 1902, and of which she died seized, intestate and leaving issue. Pp. 59, 68.

2. By the Act of June 28, 1898, and prior enactments, tribal laws in the Indian Territory were displaced and a body of laws adopted from the statutes of Arkansas was then put in force, for Indians and whites, except as they might be inapplicable in particular situations or might be superseded as to any of the Five Civilized Tribes by future agreements. P. 62.

3. Statutes of Arkansas adopted by Act of Congress for the Indian Territory, carried with them the settled constructions placed upon them by the Arkansas courts before such adoption. P. 62.

4. Under Chapter 20 of Mansfield's Digest of Arkansas Statutes, as modified by c. 104, both of which were extended to Indian Territory, curtesy initiate was not recognized and curtesy consummate was recognized only where the wife died seized of the land and intestate. P. 62.

5. The Creek Agreements, *supra*, were in the nature of a comprehensive treaty rather than a mere supplement to the fragmentary legislation that preceded them, were to have full effect regardless of any inconsistency with that legislation, and are to be construed,

not according to the technical meaning of their words, but according to the sense in which they would naturally be understood by the Indians. P. 63.

6. These agreements, given their true status as special laws for the Creeks, withdrew the lands of the Creeks from the adopted Arkansas laws of curtesy. P. 65.

7. The Act of April 28, 1904, relating to the jurisdiction of the Special Courts of Indian Territory, and providing for the continuance and extension of the Arkansas laws theretofore put in force there, and conferring full and complete jurisdiction upon the district courts of the Territory in the settlement of all estates of decedents, etc., did not subject the lands of the Creeks to the Arkansas laws of curtesy. P. 67.

113 Okla. 259, reversed.

CERTIORARI, 271 U. S. 654, to a judgment of the Supreme Court of Oklahoma sustaining a claim to an estate by the curtesy in lands allotted and patented to a Creek woman. See also the case next following.

Mr. Claude A. Niles, with whom Mr. S. P. Freeling was on the brief, for petitioner.

Mr. Harry B. Parris, with whom Messrs. Martin E. Turner ånd Kirk B. Turner were on the brief, for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This case presents a controverted claim to an estate by the curtesy in lands allotted and patented to a Creek woman in the distribution of the tribal property. The district court of the county where the lands lay rejected the claim; but on appeal to the Supreme Court of the State the claim was upheld, three judges dissenting. 113 Okla. 259.

The lands were allotted and patented under two agreements between the United States and the Creek tribe which will be described later on. The allottee was a mar-

ried woman of Creek blood and was enrolled as a member of the tribe. Her husband was a white man without tribal enrollment or membership. She died intestate November 29, 1904, while seized of the lands, and was survived by her husband, by issue of her marriage with him and by issue of a former marriage, all of the issue being Creeks and capable of inheriting the lands.

Two questions are pressed on our attention: Did the laws then applicable to the Creek lands provide for an estate by the curtesy? If so, did they extend it to a husband who was not a Creek where there were Creek descendants capable of taking the full title?

For many years the Creeks maintained a government of their own, with executive, legislative and judicial branches. They were located in the Indian Territory and occupied a large district which belonged to the tribe as a community, not to the members severally or as tenants in common. The situation was the same with the Cherokees, Choctaws, Chickasaws and Seminoles, who with the Creeks were known as the five civilized tribes. All were under the guardianship of the United States and within territory over which it had plenary jurisdiction, thus enabling it to exercise full control over them and their districts whenever it perceived a need therefor.[1]   In the beginning and for a long period, during which the districts were widely separated from white communities, the United States refrained in the main from exerting its power of control and left much to the tribal governments. Accordingly the tribes framed and put in force various laws which they regarded as adapted to their situations, including laws purporting to regulate descent and distribution [2] and to exclude persons who were not members from sharing in

[1] Stephens v. Cherokee Nation, 174 U. S. 445, 483, et seq.; Cherokee Nation v. Hitchcock, 187 U. S. 294, 305, et seq.

[2] Bledsoe's Indian Land Laws, 2d ed. pp. 640–643.

tribal lands or funds.[3]  In time the tribes came, through
advancing settlements, to be surrounded by a large and
increasing white population, many of the whites entering
their districts and living there—some as tenant farmers,
stock growers and merchants, and others as mere adven-
turers.  The United States then perceived a need for
making a larger use of its powers.[4]  What it did in that
regard has a bearing on the questions before stated.

By an act of March 1, 1889, c. 333, 25 Stat. 783, a special
court was established for the Indian Territory and given
jurisdiction of many offenses against the United States
and of certain civil cases where not wholly between per-
sons of Indian blood.  By an act of May 2, 1890, c. 182,
§§ 29–31, 26 Stat. 93, that jurisdiction was enlarged and
several general statutes of the State of Arkansas, pub-
lished in Mansfield's Digest, were put in force in the Ter-
ritory so far as not locally inapplicable or in conflict with
laws of Congress; but these provisions were restricted by
others to the effect that the courts of each tribe should
retain exclusive jurisdiction of all cases wholly between
members of the tribe, and that the adopted Arkansas
statutes should not apply to such cases.  By an act of
March 3, 1893, c. 209, § 16, 27 Stat. 645, a commission to
the five civilized tribes was created and specially author-
ized to conduct negotiations with each of the tribes looking
to the allotment of a part of its lands among its members,
to some appropriate disposal of the remaining lands and
to further adjustments preparatory to the dissolution of
the tribe.  By an act of June 7, 1897, c. 3, 30 Stat. 83–84,
the special court was given exclusive jurisdiction of all
future cases, civil and criminal, and the laws of the United

---

[3] Perryman's Creek Laws 1890, c. 7; McKellop's Creek Laws 1893,
c. 22; *Cherokee Intermarriage Cases*, 203 U. S. 76.

[4] *Heckman* v. *United States*, 224 U. S. 413, 431–435; *Sizemore* v.
*Brady*, 235 U. S. 441, 446.

States and the State of Arkansas in force in the Territory were made applicable to "all persons therein, irrespective of race," but with the qualification that any agreement negotiated by the commission with any of the five civilized tribes, when ratified, should supersede as to such tribe any conflicting provision in the act. By an act of June 28, 1898, c. 517, §§ 26 and 28, 30 Stat. 495, the enforcement of tribal laws in the special court was forbidden and the tribal courts were abolished.

Thus the congressional enactments gradually came to the point where they displaced the tribal laws and put in force in the Territory a body of laws adopted from the statutes of Arkansas and intended to reach Indians as well as white persons, except as they might be inapplicable in particular situations or might be superseded as to any of the five civilized tribes by future agreements.

Of the adopted Arkansas laws chapters 20, 49 and 104 are all that need be noticed. Chapter 20 made the common law, as far as applicable, the rule of decision where not changed by statute. Chapter 49 provided for the descent and distribution of property of intestates. Chapter 104 enabled married women to control, convey and devise their real property independently of their husbands. When first enacted chapter 20 was regarded as recognizing the common-law estate by the curtesy with both its initiate and consummate gradations. But after the enactment of chapter 104, which was a later statute, chapter 20 was construed by reason thereof as no longer recognizing curtesy initiate, which at common law vested during coverture, and as recognizing curtesy consummate only where the wife died seized of the land and intestate. *Neelly* v. *Lancaster,* 47 Ark. 175. Both chapters were adopted for the Indian Territory after that construction had become well settled; so, according to a familiar rule, the adoption included that construction. *Joines* v. *Pat-*

*terson,* 274 U. S. 544; *Adkins* v. *Arnold,* 235 U. S. 417, 421; *Gidney* v. *Chappel,* 241 U. S. 99, 102.

In 1900 the commission succeeded in negotiating with representatives of the Creek tribe an agreement such as was intended by the Acts of March 3, 1893, and June 7, 1897. That agreement—known as the original Creek agreement—was ratified by Congress March 1, 1901, c. 676, 31 Stat. 861, and became effective May 25, 1901, on its ratification by the tribal council. 32 Stat. 1971. A modifying agreement—known as the supplemental Creek agreement—was then negotiated. It was ratified by Congress June 30, 1902, c. 1323, 32 Stat. 500, and became effective August 8, 1902, through its ratification by the tribal council and the proclamation of that fact by the President. 32 Stat. 2021.

The agreements, taken together, embodied an elaborate plan for terminating the tribal relation and converting the tribal ownership into individual ownership, and also many incidental provisions controlling descent and distribution, fixing exemptions from taxation, preventing improvident alienation and protecting the individual allottees and their heirs in the enjoyment of the property. It is apparent from the terms and scope of the agreements that they were in the nature of a comprehensive treaty rather than a mere supplement to the fragmentary legislation which preceded them; and it is apparent from their repealing provisions—§ 41 of one and § 20 of the other—that they were to have full effect regardless of any inconsistency with that legislation, as was contemplated in the Act of June 7, 1897, which extended the adopted Arkansas laws to Indians.

The Arkansas law of curtesy was among the laws so extended. But that did not make it presently applicable to the Creek lands, they being then in tribal ownership. Such applicability would come only if and when indi-

vidual ownership was substituted for tribal ownership. The agreements provided for such a change, and had they stopped there that law would have become applicable. But instead of stopping there they proceeded to deal, among other things, with the taxation, alienation and devolution of the lands. Whether these further provisions in effect excluded curtesy under that law is one of the questions in this case. Of course it is a question of construction.

In taking up this question it must be remembered that the agreements were between the United States and a dependent Indian tribe then under its guardianship, and therefore that they must be construed, " not according to the technical meaning of their words to learned lawyers, but according to the sense in which they would naturally be understood by the Indians." [5]

Neither agreement contained any mention of curtesy. But they did provide to whom the land should go on the owner's death intestate. The original agreement, in §§ 7 and 28, declared that it should " descend to his heirs " according to the laws of descent and distribution of the tribe. *Washington* v. *Miller,* 235 U. S. 422, 425. Curtesy was not recognized in those laws. They were crude and soon were found to be unsuited to the new situation. The supplemental agreement, in § 6, put them aside and substituted chapter 49 of Mansfield's Digest, with two provisos declaring that members of the tribe and their Creek descendants, where there were such among those coming within the terms of that chapter, should " take the descent " to the exclusion of others.[6] *Grayson* v. *Harris,*

---

[5] *Jones* v. *Meehan,* 175 U. S. 1, 11; *Northern Pacific Ry. Co.* v. *United States,* 227 U. S. 355, 366–367; *Choctaw Nation* v. *United States,* 119 U. S. 1, 28; *Choate* v. *Trapp,* 224 U. S. 665, 675.

[6] The full section read as follows: " The provisions of the act of Congress approved March 1, 1901 (31 Stat. L., 861), in so far as they provide for descent and distribution according to the laws of

267 U. S. 352. Chapter 20 of Mansfield's Digest, on which the adopted Arkansas law of curtesy was based, was not mentioned. Chapter 49, which was particularly called into play, was the adopted Arkansas law of descent and distribution. It said nothing about curtesy.

Plainly there was nothing in the agreements which could have been understood by the Indians—or even by others—as providing for curtesy; and this is true of the tribal laws temporarily recognized by the original agreement and of chapter 49 of Mansfield's Digest which was substituted for them by the supplemental agreement.

Did the agreements, rightly construed, exclude curtesy under chapter 20 of Mansfield's Digest on which the adopted Arkansas law of curtesy rested? That law was not a special one for the Creeks; nor was it more than prospectively applicable to their lands. The agreements, on the other hand, were negotiated and put in force as special laws for the Creeks. They dealt particularly with the allotment in severalty, exemption from taxation, alienation and devolution of the Creek lands; and their provisions on these subjects were such that the Indians naturally would regard them as complete in themselves and not affected by other laws not brought into them by distinct reference. We have seen that the Arkansas law of curtesy was not thus brought in. Both agreements provided that on the death of an individual owner the lands should " descend " to the " heirs " according to particular laws designated as controlling standards—the

the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: *Provided,* That only citizens of the Creek Nation, male and female, and their Creek descendents shall inherit lands of the Creek Nation: *And provided further,* That if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

318°—28——5

tribal laws of descent being designated in the original agreement and chapter 49 of Mansfield's Digest being substituted by the supplemental agreement. In the absence of any restricting provision—and there was none— the Indians naturally would regard that provision as comprehending the full title and intended to effect its transmission to the persons who would be the heirs under the laws specially designated, and in the relative proportions there indicated. They further would understand that those persons were to take the title to the exclusion of others, and not that they were to take it subject to a life estate concurrently passing to another under a law which was not mentioned. We say " concurrently passing" because the restricted form of curtesy recognized by the Arkansas law did not attach during coverture, but only on the wife's death and then only where she died seized of the land and intestate. *Neelly* v. *Lancaster,* 47 Ark. 175, It has been described by the Supreme Court of Oklahoma as " in the nature of an estate by descent," and as passing to the surviving husband as an heir. *Zimmerman* v. *Holmes,* 59 Okla. 253, 256–257.

Some reliance is placed on the use of the words " descend" and "heirs" in the provision we are considering; but there can be little doubt that in the connection in which they were used the Indians would accept them in an untechnical and comprehensive sense. The decision last cited illustrates that their use in a broad sense is not unusual.

Our construction of that provision has support in another closely related to it. The allotment of the tribal lands was to be made among the enrolled members, including children born to them up to and including May 25, 1901; and each of these was to receive with other lands a tract designated as a homestead. Section 16 of

the supplemental agreement, closely copying a part of § 7 of the original agreement, provided:

" The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed."

Of course the homestead of a wife could not remain after her death for the use and support of children, as this provision directed it should in certain instances, and also pass on her death to her husband for his life by way of curtesy. So it is at least inferable from that direction that both the United States and the Indians understood there was to be no curtesy.

These considerations make it apparent, we think, that the agreements—given their true status as special laws for the Creeks and rightly construed—excluded curtesy under the adopted Arkansas law—or, putting it in another way, withdrew the lands of the Creeks from the operation of that law.

After the agreements were put in force, Congress included in an act of April 28, 1904, c. 1824, 33 Stat. 573, relating to the jurisdiction of the special courts for the Indian Territory, a provision reading as follows:

"All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said Territory, whether Indian, freedman, or otherwise, and full and complete jurisdiction is hereby conferred upon the district courts in said Territory in the settlements of all estates of decedents, the guardianships of

minors and incompetents, whether Indians, freedmen, or otherwise."

It is contended that this provision subjected the lands of the Creeks to the Arkansas law of curtesy and modified the agreements accordingly. We are of a different opinion. The provision was couched in general terms, did not refer to the agreements, did not mention curtesy or the Creek lands, and contained no repealing clause. No doubt it was intended to extend the operation of the Arkansas laws in various ways; but it fell far short of manifesting a purpose to make them effective as against special laws enacted by Congress for particular Indians, such as the agreements with the Creeks. We have so construed it in other cases not distinguishable in principle. *Washington* v. *Miller,* 235 U. S. 422, 427; *Taylor* v. *Parker,* 235 U. S. 42, 44. And the Supreme Court of the State had taken a like view of it even before our decisions were given. *In re Davis' Estate,* 32 Okla. 209; *Taylor* v. *Parker,* 33 Okla. 199.

We accordingly hold that at the time of the allottee's death—November 29, 1904—the laws applicable to the lands of the Creeks did not provide for an estate by the curtesy.

The Supreme Court of the State in holding otherwise in this and other cases cited in its opinion passed in silence over the status of the agreements as special laws and the exclusive nature of their provisions, and rested its decision on the other legislation adopting and extending the Arkansas laws. In this it departed from applicable decisions of this Court and in effect put aside some of its own earlier rulings.

As we hold there was no law providing for an estate by the curtesy, the fact that the surviving husband was not a Creek becomes immaterial.

*Judgment reversed.*