**UNITED STATES of America,
Plaintiff,**

v.

**Woodrow L. KIPP, Defendant.**

**Crim. No. 10095.**

United States District Court,
D. Montana,
Great Falls Division.

Jan. 3, 1974.

Robert P. Gannon, Asst. U. S. Atty., Butte, Mont., for plaintiff.

John T. McDermott, Director, Indian Law Program, University of Mont., Missoula, Mont., for defendant.

## OPINION AND ORDER

RUSSELL E. SMITH, Chief Judge.

The defendant, Woodrow L. Kipp, a Blackfeet Indian, was arrested for entering Glacier National Park without paying the entrance fee required by law. His motion to dismiss the information raises questions as to the rights of Blackfeet Indians in that portion of Glacier Park which was at one time a portion of the Blackfeet Reservation.

By the agreement of February 11, 1887, ratified by Act of May 1, 1888, 25 Stat. 113, the western boundary of the Blackfeet Reservation was established as the summit of the main chain of the Rocky Mountains. Shortly thereafter, it being thought that there might be gold (actually copper) in "them thar hills" the United States sent a commission to the Blackfeet Reservation to negotiate for the purchase of the hills. The Blackfeet Indians, by agreement dated September 28, 1895, finally sold a strip of land on the east side of the Rocky Mountains to the United States. The agreement, among other things, provided in Article 1:

> . . . *Provided,* That said Indians shall have, and do hereby reserve to themselves, the right to go upon any portion of the lands hereby conveyed so long as the same shall remain public lands of the United States, and to cut and remove therefrom wood and timber for agency and school pur-

poses, and for their personal uses for houses, fences, and all other domestic purposes: *And provided further,* That the said Indians hereby reserve and retain the right to hunt upon said lands and to fish in the streams thereof so long as the same shall remain public lands of the United States under and in accordance with the provisions of the game and fish laws of the State of Montana. 29 Stat. 354.

The agreement was ratified by the Act of June 10, 1896, 29 Stat. 357.

By Act of May 11, 1910, 16 U.S.C. § 161, Congress created Glacier National Park and included within its boundaries the tract which had been sold by the Blackfeet Indians under the agreement of September 28, 1895. The act creating Glacier National Park provided in part:

> . . . All persons who shall locate or settle upon or occupy the same, or any part thereof, except as hereinafter provided, shall be considered trespassers and removed therefrom. Nothing herein contained shall affect any valid claim, location, or entry existing under the land laws of the United States before May 11, 1910, or the rights of any such claimant, locator, or entryman to the full use and enjoyment of his land.

■ The first problem is whether, when Glacier Park was established, the rights reserved in the 1895 agreement terminated because the lands ceased to be "public lands of the United States." The term "public land" may mean land owned by a government,[1] and the term "public lands of the United States" certainly in popular usage could mean lands owned by the federal government. No doubt the term "public lands of the United States" as the term is used in federal statutes refers to those lands subject to sale or disposal under general laws (Newhall v. Sanger, 92 U. S. 761, 23 L.Ed. 769 (1875)), and were the problem merely one of statutory con-

---

1. Webster's Third ·New International Dictionary 1836 (1966) defines "public land" as: "land owned by a government, esp. a national government; *specif*: that part of the U.S. public domain subject to sale or disposal under the homestead laws."

struction it is quite clear that lands in Glacier Park would be held not to be public lands of the United States. *See* Oklahoma v. Texas, 258 U.S. 574, 42 S. Ct. 406, 66 L.Ed. 771 (1922).

■■ The writing to be interpreted, however, is not a statute but an agreement with an Indian tribe. The fact that the agreement was ratified by a law of the United States does not in my opinion make the problem one of statutory construction. All Indian treaties were ratified, and the rule of interpretation applied to them is:

> . . . that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899).

To the same effect *see* United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). The same rule applies to agreements. Marlin v. Lewallen, 276 U.S. 58, 48 S.Ct. 248, 72 L. Ed. 467 (1928).

Obviously the Indians reserved some rights under the agreement. Was there contained in the agreement, by virtue of the words "so long as the same shall remain public lands of the United States," a right in the United States to alter unilaterally the nature of its ownership and extinguish the reserved rights, and, if so, did the Indians understand that?

I turn to the circumstances existing prior to and contemporaneous with the agreement.[2] The commissioners described the land in this way: "The land sold is all mountain land, practically of no value except for the mineral deposits, principally copper, which it is believed exist there."[3] The Indians were considerably excited, holding what the Commission believed to be exaggerated ideas of the value of their mountain land for mineral purposes.[4] A boundary was determined, leaving outside the diminished reservation all mineral lands and leaving inside the reservation all grazing lands and so much of the timber lands as possible.[5] The Indians were told that so long as there was mineral land on the reservation there would be trouble with the white men—told that "The white men will come after mineral in spite of all that you and the government can do."[6] The Commission met with the Indians on September 2, 20, 21, and 23, 1895. At the adjournment of the September 23rd meeting it appeared that an agreement could not be reached. The price and quantity of the land were in dispute. On September 25th another meeting was held. At that meeting the Indians agreed to sell for one and a half million dollars the land between Birch Creek and the Canadian border. They had previously demanded three million dollars for a much smaller piece.[7] At the meeting on the 25th, however, the problem of reserved rights loomed large in the Indian mind. White Calf[8] said:

> . . . From Birch Creek to the boundary line is what I now give you. I want the timber because in the future my children will need it. I also want all the grazing land. I would like to have the right to hunt game and fish in the mountains.[9]

---

2. This would be done as a matter of ordinary contract interpretation. *See* Restatement of the Law of Contracts § 230.

3. Commissioner's Report to the Commissioner of Indian Affairs, Dec. 14, 1895.

4. *Id.*, note 3.

5. *Id.*, note 3.

6. Proceedings of Councils of the Commissioners appointed to negotiate with Blackfeet Indians, Sept. 21, 1895.

7. *Id.*, note 6, Sept. 25, 1895.

8. The only Indian whose name appears in the congressional ratification of the treaty. *See* 29 Stat. 356.

9. Proceedings of councils of the Commissioners appointed to negotiate with Blackfeet Indians, Sept. 25, 1895.

And further:

. . . We will sell you the mountain lands from Birch Creek to the boundary line, reserving the timber and grazing lands, for one and a half million.[10]

Big Brave said:

What these two old men have said I repeat. I raise my hand for every man, woman and child on this reservation. What I say they say. I raise my hand to say that we want to hunt game, fish, and cut timber in these mountains.[11]

Following these statements the Indians were told:

. . . We have written out, now[12] knowing what you have mentioned as regards your wishes, and included all the points you have made. I think it is just what you want and can agree to. It seems that after we have agreed upon the quantity of land and the price, that we all agreed in common upon the other things.[13]

From all of this it is apparent that:

1. The Commissioners were interested in the minerals and nothing else.

2. The Indians were interested in rights to grazing, timber, hunting, and fishing, and wanted to reserve them.

3. The Indians knew that the lands would be opened for mineral entry and that some of the reserved rights could be diminished as lands became privately owned.

4. Neither party had any land values in mind except those expressly mentioned.

5. The Indians were told that the agreement expressed their wishes and were not told that under the agreement the United States could alter the character of its ownership and defeat the reserved rights.

The agreement, fairly construed in light of all the circumstances, evidenced an intent that the lands would be opened for mineral entry,[14] but that the Indians would have the reserved rights in the lands remaining in public ownership. It does not do violence to the agreement to hold the words "so long as the lands shall remain public lands of the United States" were used to distinguish between the lands which would move into private ownership by reason of mineral entries and those which would remain in the ownership of the United States. It is inconceivable that the Indians understood that there was hidden in the questioned phrase a privilege in the United States to terminate the reserved rights by changing the character of the public ownership.

Whatever rights the Indians may have obtained as a result of their agreement could have been extinguished by the United States which had a plenary power over the Indian property. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); Nicodemus v. Washington Water Power Co., 264 F.2d 614 (9th Cir. 1959). As I have interpreted the agreement, the United States had promised the Indians the reserved rights so long as the United States owned the lands. Did the United States exercise its plenary power and extinguish those rights by the Act of May 11, 1910, 16 U.S.C. § 161, creating Glacier National Park? Do the words in the Act—

. . . All persons who shall locate or settle upon or occupy the same, or any part thereof, except as hereinafter provided, shall be considered trespassers and removed therefrom.

---

10. *Id.,* note 9.

11. *Id.,* note 9.

12. In the copy of the proceedings attached to the Government's brief the word "not" appears. This is probably the result of a mechanical error.

13. Proceedings of councils of the Commissioners appointed to negotiate with Blackfeet Indians, Sept. 25, 1895.

14. The Act of June 10, 1896, opened the land for mineral entry only.

Nothing herein contained shall affect any valid claim, location, or entry existing under the land laws of the United States before May 11, 1910, or the rights of any such claimant, locator, or entryman to the full use and enjoyment of his land. . . .

—indicate an intention on the part of the United States to exclude Indians from that part of Glacier Park which had been a part of the reservation? Conceivably the word "claim" could be interpreted to mean mining claim, and the words "land law" could be interpreted to refer only to the public land laws under which extensive portions of the public domain were virtually given away. If these are the proper meanings, then there was Congressional intent to protect every private right within the Park except those rights which arose out of the agreement between the United States and its wards, which agreement was based upon a very real consideration. If respect is given to the rule that an intention to alter a substantial right created by treaty is not to be lightly attributed to Congress (United States v. Payne, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924); Anderson v. Gladden, 293 F.2d 463 (9th Cir. 1961)), then the word "claim" can be construed to embrace the Indian reserved rights, and the words "land laws" can be held to embrace the Act of June 10, 1896, 29 Stat. 357. That act did open the lands to mineral entry, did ratify the agreement, and did, in a somewhat ambiguous phrase, make the opening of the lands for mineral entry "subject to the articles of the foregoing agreement" (the agreement of September 25, 1895). I con-

clude that the reserved rights were not extinguished by the act creating Glacier Park.

The crime charged is the violation of 43 C.F.R. §§ 18.7 and 18.13. Since the defendant had a right to enter that portion of Glacier National Park which was at one time within the boundaries of the Blackfeet Indian Reservation, the regulations so far as they relate to the defendant are invalid.[15]

The motion to dismiss is granted and the action is dismissed.[16]

---

15. Nothing is involved in this case but the bare right of entry, and nothing said here purports to pass upon the nature or quantum of any other rights.

16. There is now at hand a communication from the defendant requesting that the case be returned to the United States Magistrate. Apparently if the case were returned defendant would plead guilty and the problems raised here would not be resolved. It is probable that defendant was hopeful that at

some other time and place a more favorable climate and forum for litigation involving Indian rights in Glacier Park might be found. By the time I received the communication I had decided that no crime had been committed and I could not, consistent with the spirit of Fed.R.Crim.P. 11, which requires that the court "shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea . . . .," remand the case so that a guilty plea might be taken by the magistrate.