**UNITED STATES of America, Plaintiff,**

v.

**Bailey D. PETERSON and Glenn W. Hohmann, Defendants.**

**No. CR00–9–M–DWM.**

United States District Court, D. Montana, Missoula Division.

Nov. 17, 2000.

Daniel R. Wilson, Kalispell, MT, for Bailey D. Peterson, defendant.

John Rhodes, Federal Defenders of Montana—Missoula Branch, Missoula, MT, for Glenn W. Hohmann, defendant.

Kris A. McLean, Office of the U.S. Attorney, Missoula, MT, for U.S. Attorneys.

## ORDER

MOLLOY, District Judge.

### I. Factual Background

This case presents the issue of whether Blackfeet Treaty Rights to hunt and fish in the area known as Glacier Park were abrogated when Glacier Park was created by Congress. For the following reasons, I find the Blackfeet have no treaty right to hunt in Glacier Park.

### A. The Agreement History

In 1895, three Commissioners dispatched by the United States government arrived at the Blackfeet Reservation with a proposal for the Blackfeet Tribe. They wanted to buy a strip of land on the western portion of the Reservation. The strip ran from the summit of the main chain of the Rocky Mountains in the west to a line running south and southeast from the summit of Chief Mountain in the east. This mountainous territory was thought to contain mineral riches that the Government wanted to exploit. It is clear the Blackfeet wanted no part of this proposal. It is also clear they wanted to keep certain rights, including hunting rights. The Commissioners offered to pay a nominal sum of $1 million for this land.

The Blackfeet resisted the sale. The transcript of the negotiations shows that the Blackfeet were aware that a cession would probably mean the abandonment of hunting rights they wanted to keep in the ceded territory. On September 21, 1895, the first day of the unwanted negotiations, Little Dog said, "From Cut Bank north to the boundary line is what I wish to sell. When any young man goes out to kill game he will then know where the line is and can kill game for his family." S. Doc. No. 118, 54th Cong., 1st Sess., at 10 (Feb. 12, 1896).

Initially, the Blackfeet asked $3 million for the land. The Commissioners—William Pollock, George Bird Grinnell, and

Walter Clements—refused, saying that Congress would not ratify a $3 million deal. The Tribe urged the Commissioners to consider seriously their offer, because they had no intention of revising it. Negotiations were on the verge of breaking down.

Little Dog: I am about to make a proposition on that land and I think it will surprise you; make you faint and fall down. We don't want the Great Father to feed and clothe us all our lives. We ask for the land north from the railroad Three Million Dollars, so we will be able to maintain ourselves and care for our wives and children. There are many things in which the Great Father has cheated us. Therefore we ask Three Million Dollars for that land. Those mountains will never disappear. We will see them as long as we live; our children will see them all their lives, and when we are all dead they will still be there. This money will not last forever. I knew that you would be afraid when I told you our price, so I will rest awhile and let you consider it, as we do not intend to retreat or go back. You must not forget that we have wives and children; it is for them that we ask this money. Those mountains will last forever; the money will not. I will now sit down and give you time to consider and let us know the results of your decision.

Mr. Pollock: The Commission has studied this matter carefully since coming here three weeks ago. There may be mineral. No one can tell whether it is in paying quantities or not. We have based our proposition on the fact that there may be. If there is no mineral, the government will never get as much money from it as it pays. You have asked twice as much for this mountain land as you did for a larger tract of land upon which your cattle could graze. It is true that these mountains have always been there. They were there when your grandfathers lived. They never furnished you houses; never fed your cattle nor fed you and clothed you. I am glad to know that you think of your wives and children; but can you send them to these mountains to ask for food, clothing, wagons and cattle? You must know that you can keep those mountains forever and not realize anything from them. It is true that the money you may get will be gone after a time, but in the meantime you will be getting clothing, blankets, cattle, wagons, food, etc. That money offers you all these things while the mountains offer you nothing but snow and ice and rock. I leave it for you to choose which you will take.

Little Dog: I have two things to tell you, then some others will talk. I know that you are trying now to say that the mountains are of no benefit to us. I know that they are of some benefit to us. It is a fact that when a small child places a value upon an article an older person will take pity and give it more than it asks. We want you to treat us in the same manner.

S. Doc. No. 118, 54th Cong., 1st Sess., at 12 (Feb. 12, 1896).

The Commissioners persisted in trying to convince the Tribe to reconsider its price. The Blackfeet wanted nothing to do with what can plainly be viewed as an adhesion negotiation.

Mr. Pollock: I had hoped when we got together that we could come closer together. I thought later on that we would have to leave to-morrow, but have concluded to meet you to-morrow, at ten o'clock, and I hope you will come to some definite conclusion. As Mr. Grinnell has said it will do you an injury to agree to your proposition. We would be glad to do so if we thought Congress would ratify it, but we feel certain that it will not. I repeat that we would gladly do so if it would do any good. To do so would make you and us the laughing stock of

the whole country. We will be sorry to go away without making an agreement with you, but would rather make one that would be more acceptable to Congress. We have the kindliest feelings towards the Piegans, and you should not blame us for not meeting your proposition and making a treaty when you know it would be useless. We hope to begin promptly.

Little Dog: For what object shall we meet again?

Mr. Pollock: Some have not spoken, and then we want to give you another chance to talk this matter over.

Little Dog: We had better come together now and save another meeting; we can then go home. You have named your price and we have named ours. We will never recede. We cannot agree. Why meet again then?

. . . .

*Id.* at 18.

For two days, the Commissioners waited while the Tribe deliberated. After conferring with the resident Agent, Major Steell, the Blackfeet offered to take $1.5 million, reserving their hunting and fishing rights in the mountains, securing an anti-allotment clause, and expressing their unwillingness to sell any more land in the future. The Blackfeet reserved their rights to take timber from the land for "so long as the same shall remain public lands of the United States." Agreement of September 26, 1895, art. I (Gov't Exh. A); Act of June 10, 1896, 29 Stat. 353 (1896) ("the Agreement"). They retained their right to hunt on the land and fish in the streams for "so long as the same shall remain public lands of the United States, under and in accordance with the provisions of the game and fish laws of the State of Montana." *Id.*

The instigation of this deal came not from the Indian people but from the Nineteenth Century Federal government. It was perpetrated by a policy that would lead to the exploitation of extractable resources during the heyday of Montana's developing mining boom. The negotiations on reflection raise issues of paternalism, ethnocentrism and adhesion. But the Commissioners and the Blackfeet made a deal.

The Agreement, signed by the Commissioners and by a majority of the male members of the Blackfeet Tribe on September 26, 1895, was ratified by the Senate in June of 1896.

The Agreement describes a line running south and southeast from Chief Mountain and cedes all land west of that line to the United States. Before the Agreement was signed, the western boundary of the Reservation was the "summit of the main range of the Rocky Mountains." The northern boundary was the boundary with Canada, and the southern boundary was measured off the North Fork of Birch Creek. *See* Agreement of Feb. 11, 1887. The mountain known today as Spot Mountain lies within the territory ceded by the Blackfeet to the United States in the Agreement.

About fifteen years after the Blackfeet signed the Agreement with the Commissioners, Congress created Glacier National Park. The lands ceded by the Blackfeet constitute the eastern portion of Glacier.

### B. The Criminal Conduct

On January 18, 2000, two National Park Service biologists were surveying bighorn sheep on Spot Mountain, inside Glacier National Park, when they heard two cracks from a rifle. They saw one of the defendants kneeling near a dead bighorn on the east slope of the mountain. The shooter severed the bighorn's head and began carrying it northeastward, toward the boundary line between the Park and the Reservation. The biologists then heard another volley. Shortly thereafter, they saw the other defendant traversing Spot Mountain toward the first shooter.[1]

---

**1.** At trial, there was a distinct difference in what the biologists thought they saw and what the defendants admitted happened.

The biologists radioed the hunters' location to Forest Service officers, who apprehended the defendants on the Blackfeet Reservation, on Highway 89 near Kiowa Junction.

According to the Government, both defendants admitted, at a subsequent meeting of the Blackfeet Tribal Business Council, that they killed three bighorn sheep. They did so in order to sell the heads and/or meat. At trial, the facts showed the sheep were not field dressed in the usual fashion for the preservation of the meat.

### C. Jury Trial

On November 1, 2000, Defendant Peterson was convicted by a jury of two violations of the Lacey Act. Defendant Hohmann was acquitted. Defendant Peterson's conviction poses the question of whether members of the Blackfeet Tribe are privileged to hunt in the lands ceded by the Blackfeet Tribe to the United States in the 1896 Agreement. In other words, do the Blackfeet have a treaty right to hunt within the exterior boundaries of Glacier Park? I find they do not.

### II. Procedural Background

### A. Indictment

Peterson and Hohmann were indicted on April 6, 2000, for conspiring to violate the Lacey Act and for committing substantive Lacey Act violations.

They moved to dismiss the Indictment, arguing that the Federal Court lacks jurisdiction. This claim was based on an argument that the hunting took place on a strip of land east of the main chain of the Rocky Mountains and west of the current western boundary of the Blackfeet Reservation ("the ceded lands"). They argued that the Blackfeet Nation reserved hunting rights in the ceded lands even though the land was sold in 1895. Peterson's motion to dismiss also argued that the Indictment fails to state an offense.[2]

### B. Speedy Trial and Briefing

The case was declared unusual or complex and speedy trial calculations were tolled, under 18 U.S.C. § 3161(h)(8)(B)(ii). A briefing schedule was set. I invited amicus briefs from the Blackfeet Tribe, the State of Montana, Professors Raymond Cross and Maylinn Smith of the University of Montana School of Law, the Indian Law Resource Center in Helena, Montana, and the Native American Rights Fund in Denver. Of these invitees, only Professor Maylinn Smith of the Indian Law Clinic at the University of Montana submitted a brief.

I held an evidentiary hearing on October 10, 2000. Expert testimony was presented in the morning and oral argument in the afternoon. Later, at trial, defendants made additional motions for acquittal at the close of the Government's case, pursuant to Fed.R.Crim.P. 29(a). The statutory language creating Glacier National Park abrogated whatever hunting right the Blackfeet Tribe retained in the ceded lands when Congress created Glacier National Park. For that reason, I denied Peterson's and Hohmann's motions for judgments of acquittal at the close of the Government's case.

### III. Analysis

### A. Jurisdiction

Initially, Peterson and Hohmann took the position that the actual boundary between Glacier National Park and the Blackfeet Reservation was incorrectly drawn. Assuming this was true, they argued that their conduct, which allegedly occurred on Spot Mountain, took place on the Blackfeet Reservation, not in Glacier Park. If their facts were right, they argued, jurisdiction belonged in Tribal Court.

The argument did not pan out. A discrepancy allegedly existed between the 1895 sale agreement and the agreement ratified by Congress.[3] However, even if

---

**2.** Defendant Hohmann joined in Defendant Peterson's motion.

**3.** The defendants allege that the Agreement signed by the Commissioners and the Tribe places one boundary line "*six* miles west of the western end of the railway bridge across

there was a discrepancy between the 1895 Agreement signed by Blackfeet tribal members and the version of the Agreement ratified by Congress in 1896, Spot Mountain is not affected. The parties conceded at oral argument that the boundary question was no longer an issue in the case. Spot Mountain is within the exterior boundaries of Glacier National Park.

■ The parties framed the issue as one of jurisdiction. I do not believe jurisdiction is an issue. The federal government has the power and authority to enforce its laws in Glacier National Park, whether their source is statutes, regulations, or treaties. *See* 16 U.S.C. §§ 162, 163, 170. If the defendants broke the laws of the United States within the Park, they are subject to federal jurisdiction.[4] The perplexing question here is the identity of the persons against whom the United States may enforce its laws in Glacier Park. The

issue is whether those persons, if they are Blackfeet, retained possible privileges under the 1896 Agreement to hunt in the ceded strip if the land is within Glacier Park.

**B. Does the Indictment State an Offense?**

Defendant Peterson argues that the Indictment fails to state an offense against the United States. The foundation of his argument is that the Agreement reserved the Tribe's right to hunt and fish in the ceded lands. He claims, as a tribal member, that he is privileged to hunt in the Park.[5]

The factual dispute whether the Tribe retained the right to hunt in the ceded lands concerns the meaning of events that took place and language that was used in 1895 and 1896.[6] My reading of the record, and listening to the testimony about it,

---

the north fork of the Two Medicine River." Congress' ratified version described this particular boundary line as *"four* miles west of the western end of the railway bridge across the north fork of the Two Medicine River." This discrepancy, if it exists, would affect the eastern boundary of the ceded lands.

4. A violation of tribal law can serve as the predicate offense for a Lacey Act prosecution. *See* 16 U.S.C. § 3372(a)(1) ("It is unlawful for any person to … acquire … any … wildlife … taken, possessed, transported, or sold … in violation of any Indian tribal law."). *See also United States v. Big Eagle,* 684 F.Supp. 241 (D.S.D.1988), *aff'd,* 881 F.2d 539 (8th Cir.1989).

The 1896 Agreement was made between the federal government and the Blackfeet Tribe. There is no indication in its language that the rights reserved should belong to the individuals who signed the Agreement. The reserved rights, whatever their extent, belong to the Tribe. Consequently, the Tribe has the right to regulate exercise of the rights by its members. *Cf. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 679, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Under the Tribe's regulations, "it is unlawful to buy, sell, or offer to buy or sell fish or big game meat unless specifically permitted to do so by rule or regulation." Blackfeet Tribe Fish & Wildlife Regs., ch. 3, § 2(B), *quoted in* Amicus Brief of the Indian Law Clinic, at 5. The Government alleges that the

defendants admitted that they intended to sell the bighorns' heads and/or meat.

For these reasons, the Lacey Act generally authorizes prosecution in federal court regardless of whether the Tribe retained the right to hunt in the ceded lands. No charge of violating Tribal fish and game laws was set forth in the Indictment here.

5. Peterson introduced at trial his tribal hunting permit. Defendant Hohmann testified that a tribal hunting permit can be used in areas under the jurisdiction of the State of Montana as well as on the Blackfeet Reservation. The Government countered with a map of the Blackfeet Reservation showing the boundaries within which hunting was permitted. That map did not include Spot Mountain. Blackfeet Fish & Game official Ira Newbreast testified he did not believe that the Tribe could authorize Peterson or Hohmann to hunt in Glacier National Park.

Because the question of whether the Tribe authorized Peterson to hunt on Spot Mountain has not been definitively answered, this Opinion assumes that the Tribe authorized Peterson to hunt on Spot Mountain.

6. The Blackfeet Tribe signed the Agreement in September, 1895. The United States Senate ratified the Agreement in June, 1896. With the exception of the alleged boundary dispute, *see* note 3 *supra,* the Senate ratified the same language that the Tribe reviewed and signed.

leaves little doubt that the Blackfeet were unhappy with the "Great Father's" brazen mission to buy land from the Blackfeet that they did not want to sell. The fact remains that a sale agreement was formulated and signed by members of the Tribe and by the three United States Commissioners.

█ Under today's canons of construction, I must first determine "how the . . . signatories to the Treaty understood the agreement[,] because [courts] interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (citing *United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 49 L.Ed. 1089 (1905)). Indian treaties are to be interpreted liberally in favor of the Indians. *Mille Lacs,* 526 U.S. at 200, 119 S.Ct. 1187. Ambiguities are to be resolved in the Indians' favor. *Id.* (citing *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 52 L.Ed. 340 (1908)).

█ These canons of construction, designed to recognize the federal government's unique trust responsibility toward Indians, are judicial creations. Congress, on the other hand, has plenary power " 'to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so.' " *United States v. Dion,* 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986) (quoting *Lone Wolf v. Hitchcock,* 187 U.S. 553, 566, 23 S.Ct. 216, 47 L.Ed. 299 (1903)). The Supreme Court's test for congressional abrogation is "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Dion,* 476 U.S. at 740, 106 S.Ct. 2216.

With these principles of construction in mind, there are two questions that must be answered in order to determine whether the Indictment states an offense or whether Defendant Peterson is entitled to acquittal despite the jury's verdict. First, did the Indians understand the 1896 Agreement to mean that they retained the right to hunt in the ceded lands? Second, did Congress abrogate the 1896 Agreement when it created Glacier National Park?

### 1. Did the 1896 Agreement reserve to the Blackfeet Tribe the right to hunt in the ceded lands?

█ Defendant Peterson argues that the language contained in the Agreement would have been interpreted by the Blackfeet Tribe to mean that their hunting rights would "continue indefinitely and diminish only as individual mineral claims were made." Peterson Br. at 8. As Peterson points out, "[w]hether a hundred or a thousand miners might have filed into the ceded strip fifty years after the Agreement, surely, the Blackfeet did not anticipate that they would occupy and crowd all of it." *Id.* To whatever extent the Tribe may have contemplated the diminishment of their right to hunt in the lands east of the main range of the Rockies, they must have understood that the impact on hunting would be minimal. Peterson argues that the Tribe's probable understanding of the Agreement should control its interpretation today. Thus, he concludes that the Blackfeet Tribe still retains the right to hunt in the ceded lands. As such, he argues he did no wrong.

The Government, on the other hand, argues that the language in the Agreement is "self-limiting." The Tribe retained a right to hunt on condition that the ceded lands remained "public lands." When Glacier was created, the Government asserts, the ceded lands ceased to be "public lands," and the Tribe's right to hunt was terminated.

The disputed language reads as follows:

[T]he said Indians hereby reserve and retain the right to go upon any portion of the lands hereby conveyed [by the Tribe to the United States] so long as the same shall remain public lands of the United States, and to cut and remove therefrom wood and timber for agency and school purposes, and for their personal uses for houses, fences, and all other domestic purposes: And further, That the said Indians hereby reserve and retain the right to hunt upon the said lands and to fish in the streams thereof *so long as the same shall remain public lands of the United States under and in accordance with the provisions of the game and fish laws of the State of Montana.*

29 Stat. 354 (emphasis added).

The suggestion that the Blackfeet Tribe would have (a) contemplated the establishment of a national park in the ceded lands [7] and (b) realized that the establishment of a national park would cancel out the ceded lands' existence as "public lands of the United States" is not credible. To accept the United States' argument requires that I ignore all three canons of treaty construction. If it was simply a question of what the Indian people understood, perhaps Peterson would prevail.

The transcript of the negotiation, S. Doc. No. 118, 54th Cong., 1st Sess. (Feb. 12, 1896), makes plain that the Tribe thought it was reserving something important and durable. In fact, it was the Tribe's retention of the rights to hunt, fish, and gather timber from the ceded lands that made the deal. The better interpretation of the contested language is that the United States might sell parcels of the land to private interests—miners or mining companies or even the occasional white settler—and that such sales would mean that the Tribe would not be able to hunt, fish, or gather timber on that private land. As Peterson argues, neither in 1895 nor even today would anyone seriously believe that the entire area would be parceled out, bit by bit, to private interests. Instead, the arrangement was designed to allow the United States to encourage and manage mining development in the area without requiring the Tribe to deal with each individual miner.[8] In fact, the Act of June 10, 1896, which ratified and confirmed the Agreement, explicitly provided that "the lands ceded should be open to occupation, location and purchase, under the provisions of

---

7. The parties debate the impact of "a change in the character of the public ownership." The defendants are correct when they say this arcane concept would not have had much meaning to the Blackfeet in 1895. However, the whole proposition ignores the fact that, at the time of the Agreement, only two uses were contemplated for the land: Indian reservation and mining settlements. Even the United States, at this point, was not considering "a change in the character" of its ownership. It was only considering the sale of parcels of the ceded lands to private interests.

8. Commissioner George Bird Grinnell told the Indians that he had discussed with the Secretary of the Interior the possibility of the United States' acting as an agent for the Indians' sale of the land to private interests. He did not recommend that course of action.

> If it were all good land the white man would buy it and settle upon it, but it is not all good land, and when they look it over and learn that it is mostly poor land, they will go away and the Indians will get noth-

ing.... If you people would rather have the government sell the land for you, you may say so, but I don't think it would be as good for you as the other way.... I think you will do better to take the one million dollars.

S. Doc. No. 118, 54th Cong., 1st Sess., at 17–18 (Feb. 12, 1896).

On the other hand, Grinnell refused to discuss the possibility of letting the Indians develop the mineral rights themselves.

> Mr. Horace Clark: [W]hy can [the Secretary] not allow us to go ahead and develop these lands ourselves? If he could do that we would gladly develop them and show them up so they would be saleable.
>
> Mr. Grinnell: I think it can not be done under the present laws. New laws would have to be made by Congress. The Secretary has not that power now.
>
> Mr. Clark: I know there are fine top showings in copper, silver and gold. We would gladly develop them.
>
> Mr. Grinnell: It can not be done now.

*Id.* at 18.

the mineral land laws only." Solicitor's Opinion, 1916, Gov't Reply Exh. A at 3 (referring to Act of June 10, 1896, 29 Stat. 321, 357); *see also* S. Doc. No. 118, 54th Cong., 1st Sess. (Feb. 12, 1896), at 36 (letter from General Land Office at the Department of the Interior recommending inclusion of provision in Senate's ratification of treaty to provide that "the lands so surrendered shall be open to occupation, location, and purchase under the provisions of the mineral-land laws only.").

When the Tribe asked $3 million for the land, the United States balked, ostensibly suspecting that the land's utility for mining would not warrant such an outlay. The question of what ulterior motives were involved is of no relevance here.[9] The bargain was struck for $1.5 million when the Indians realized they could continue to use the land as they were accustomed to do.

> White Calf: Chief Mountain is my head. Now my head is cut off. The mountains have been my last refuge. We have been driven here and now we are settled. From Birch Creek to the boundary line is what I now give you. I want the timber because in the future my children will need it. I also want all the grazing land. I would like to have the right to hunt game and fish in the mountains.... Now, we will sell you the mountain portion of our land and we will make a good treaty, but in the future we don't want our Great Father to ask for anything more. We don't want our land allotted.

S. Doc. No. 118, 54th Cong., 1st Sess., at 19 (Feb. 12, 1896).

The legal description of the land ceded by the Blackfeet in the 1895 document is

immediately followed by their reservation of rights in the timber, fish, and game. Nothing in the record suggests that the Blackfeet understood that their rights could terminate while the United States still held the land.

A different phrase in the document might be construed to suggest that the Indians knew their hunting and fishing rights might be extinguished altogether rather than piecemeal by sales of parcels of land to private interests. The treaty states that the "Indians hereby reserve and retain the right to hunt upon the said lands and to fish in the streams thereof ... under and in accordance with the provisions of the game and fish laws of the State of Montana." The United States proposes that the Indians understood their hunting rights would be determined by the State of Montana and concludes that the State's return of authority in Glacier Park to the federal government extinguished those rights. There is nothing in the transcript of the negotiations to indicate that the Blackfeet agreed to let the State of Montana decide whether and when its hunting rights should be extinguished.

There is no need to determine the precise meaning of this phrase, because the issue was mooted when Montana abdicated its authority back to the federal government. Nonetheless, the phrase means something. There are two possible interpretations. One option is to read it as establishing a right in the Indians to hunt and fish off the reservation, a right that would guarantee them access similar to that entailed in *United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).[10] Under this view, the State would not have the power to extin-

---

**9.** Professor Charles Adrian Heidenreich testified that Grinnell stopped by the offices of the Great Northern Railway in Minneapolis on his way out to Montana to discuss tourism in the West. The Great Northern skirts the ceded lands. There is no evidence that Pollack, Clements, or the Blackfeet Tribe knew of Grinnell's possible hidden agenda.

**10.** "Indian treaty rights can coexist with state management of natural resources.... Indian

treaty-based usufructuary rights do not guarantee the Indians 'absolute freedom' from state regulation." *Mille Lacs,* 526 U.S. at 204, 119 S.Ct. 1187. In *Winans,* settlers were preventing Indians who had a treaty right to fish in certain waters from reaching those waters and were occupying large tracts of the waters and excluding Indians. The Supreme Court ordered the state to accommodate the Indians.

guish the Tribe's rights, merely to regulate exercise of its rights.

The second possible interpretation is argued by Professor Maylinn Smith in her amicus brief for the Indian Law Clinic at the University of Montana. She argues that this language should be construed in light of the situation existing before the making of the Agreement. Before the Agreement, the ceded lands were part of the Reservation. The Blackfeet Tribe therefore had jurisdiction over the land, at least over its own members' conduct on it. Because the Indians reserved the right to hunt and fish, she argues, the reference to the laws of the State of Montana is essentially a choice of law provision. As such, it would not interfere with the Tribe's power to enforce laws against and on behalf of its own members in the ceded lands; it would merely give the Tribe the proper law to apply.

Each of these constructions is more plausible than the Government's argument that the Indians knew they had just granted power over their hunting rights to the State of Montana. The United States' argument that the State effectively held the Tribe's rights and extinguished them when it turned governance of the ceded lands over to the United States is rejected.

**11.** As evidence of Congress' intent to abrogate treaty rights or of its belief that any such rights would automatically terminate upon creation of the Park, the Government offers a letter from Frederick K. Vreeland, Chairman of the Subcommittee on National and International Parks for the Camp Fire Club of America. The letter was included in the legislative history when Congress outlawed hunting in the Park. *See* H. Rep. No. 62–812, at 7 (1912); H. Rep. No. 62–1456, at 7 (1913). Vreeland's theory was that the Tribe's treaty rights were extinguished when the State of Montana relinquished jurisdiction over the ceded lands on May 11, 1910.

However, the letter does not illuminate the question whether Congress "actually considered" the Blackfeet Tribe's treaty rights in the ceded lands when it requested the State of Montana to cede jurisdiction over them back to the federal government. If Vreeland's theory is correct, the abrogation occurred upon Montana's cession of jurisdiction, so that is when the court must look for evidence that

The Blackfeet believed they would have hunting, fishing, and gathering rights in the ceded lands except as to those parcels of land that were purchased by private interests. Nothing on the face of the agreement is incompatible with this conclusion. Consequently, I find the Blackfeet Tribe retained hunting rights in the lands that eventually became part of Glacier National Park. However, the story does not end with this determination. If it did, Mr. Peterson would be entitled to a judgment of acquittal as a matter of law.

### 2. Did Congress abrogate the 1896 Agreement when it created Glacier National Park?

Abrogation is a troubling question in this case because there is scant evidence contemporary with the creation of Glacier National Park to show that Congress "*actually considered* the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *United States v. Dion*, 476 U.S. 734, 740, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986) (emphasis added).[11] The level of proof demanded by *Dion*—"clear evidence," *id.*—reflects judicial recognition of the federal government's unique trust responsibilities toward Indian tribes.[12]

Congress "actually considered" a potential conflict between treaty rights and its proposed action. Vreeland's letter is as likely to be an *ex post facto* rationalization as it is to be a Congressional determination that Montana's cession of jurisdiction would legally end the Tribe's hunting rights.

**12.** Under the Fifth Amendment, Tribes can demand compensation for treaty rights "taken" by Act of Congress. For that reason, as well, courts generally take a dim view of abrogation. *See Menominee Tribe v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) ("We find it difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying property rights conferred by treaty.").

In the 1930's, the Blackfeet Tribe brought a takings claim before the United States Court of Claims based on their right to hunt in the ceded lands:

However, other statements of the standard fit the facts of this case. *Dion* also says that the record must "reflect an unmistakable and explicit legislative policy choice," *id.* at 745, 106 S.Ct. 2216, that treaty rights take second priority to Congress' proposed action. Moreover, "*absent explicit statutory language,* [courts] have been extremely reluctant to find congressional abrogation of treaty rights." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 690, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (emphasis added). Here, the statutory language prohibiting "all" hunting in the Park and the reports of the Committee on Public Lands are inconsistent with allowing the Blackfeet to hunt in the eastern portion of Glacier.[13]

The most pertinent portion of the legislation creating Glacier National Park reads as follows:

*All hunting or the killing, wounding, or capturing at any time of* any bird or *wild animal,* except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, *is prohibited within the limits of said park;* ... The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary and proper for the management and care of the park and for the protection of the property therein, *especially for ... the protection of the animals and birds* in the park *from* capture or *destruction,* and *to prevent their being frightened or driven from the park.*

Act of Aug. 22, 1914, c. 264, § 4, 38 Stat. 700 (codified at 16 U.S.C. § 170) (emphasis added).

The directive to the Secretary to prevent animals being "frightened or driven from" the Park is noteworthy. Combined with the prohibition against "all" hunting or capturing, it indicates that the Park was to be a sanctuary. To ensure that it served that function, Congress also foreclosed the possibility that the sanctuary would be honored in its breach. Congress foresaw and prevented any attempt to remove the game in the Park to some other location where it was not protected from hunting, killing or capture. The nearest and most convenient location to which game could be driven from the eastern portion of the Park was the Blackfeet Reservation.

The report of the Committee on Public Lands, which had primary responsibility for the legislation creating the Park, supports this interpretation of the Act.

[I]t is believed that ... game animals and birds will increase in numbers, if protected by law from interference, to such an extent as to furnish in the overflow from the park a tempting supply to sportsmen for all time to come, whereas in the absence of such protection of the breeding ground many of the animals, particularly the sheep and the goats, will become practically extinct within a very short time.

Claim of plaintiffs, the Blackfeet Tribes, based on the acts of the defendant, under the act of Congress of May 11, 1910 (36 Stat. 354), in taking from them and depriving them of the right ... to hunt and fish thereon, a tract of land constituting a part of Glacier National Park, which rights had been reserved by the plaintiffs in an agreement with the defendant ratified by the act of June 10, 1896 (29 Stat. 321), $250,000. *Blackfeet, Blood, Piegan, and Gros Ventre Nations v. United States,* 81 Ct.Cl. 101, 117 (1935). It is not clear whether the court ruled on this claim.

**13.** "Explicit statutory language" need not contain the phrase "treaty rights" or refer to the particular treaty or treaties in question. In *Dion,* the Supreme Court found a wide array of treaty rights were abrogated by Congress' prohibition against shooting bald eagles. *See* 16 U.S.C. §§ 1531 et seq. (Endangered Species Act); 16 U.S.C. §§ 668 et seq. (Eagle Protection Act); *Dion,* 476 U.S. at 740–44, 106 S.Ct. 2216. No treaty was specifically mentioned in any part of the statute or in the legislative history. Notwithstanding these omissions, the Court found clear evidence that the statutes in question abrogated provisions of any treaty guaranteeing the right to hunt to any tribe.

S.Rep. No. 106, 61st Cong., 2d Sess., at 2 (Jan. 20, 1910); *see also* S.Rep. No. 580, 60th Cong., 1st Sess., at 1 (April 29, 1908) (same). The "overflow" of game would benefit the Blackfeet Tribe because it controls access to hunting on the Reservation. Moreover, the continuation of a hunting right in the Tribe would have conferred a monopoly that could be exploited by the Tribe to defeat Congress' decision to protect the wildlife in the Park. Congress chose not to authorize the Secretary of the Interior to develop regulations allowing hunting by Indians or anyone else. With the sole exception of animals seen killing or injuring people, Congress unequivocally terminated all hunting in the Park.

■ Although Congress, in so many words, did not explicitly refer to the Blackfeet Tribe's treaty rights in the ceded lands, its language and the surrounding facts and context reveal Congress' designs in creating Glacier National Park.[14] Where Congress' intent is clear, and where a treaty right is incompatible with the realization of that intent, courts must conclude—repellent as the repudiation of a trust duty is—that Congress abrogated the treaty right.

Defendants argue that a savings clause tacitly recognized the Blackfeet Tribe's treaty rights in the ceded lands. 16 U.S.C. § 161 provides that "[n]othing herein contained shall affect any valid claim, location, or entry existing under the *land laws* of the United States before May 11, 1910, or the rights of any such claimant, locator, or entryman to the full use and enjoyment of his land" (emphasis added). "Land laws" refers to the General Mining Law of 1872 and various provisions recognizing settlers' patents, for example, on the shores of Lake McDonald. "Land law" is not "treaty rights" in another lingo.

Defendants also invoke *United States v. Kipp,* 369 F.Supp. 774 (D.Mont.1974), in which Chief Judge Russell E. Smith recognized that members of the Blackfeet Tribe retained a right of entry into the ceded lands. He ruled that tribal members need not pay the Park's entrance fee. However, he noted that "nothing said here purports to pass upon the nature or quantum of any other rights." *Id.* at 778 n. 15. The purpose of the Park was not incompatible with tribal members' rights of entry. By contrast, the purpose of the Park is incompatible with tribal members' right to hunt. *Kipp* is not controlling or persuasive precedent.

### Conclusion

The language of the statute and the report of the Committee on Public Lands, taken together, reflect "an unmistakable and explicit legislative policy choice" that the Blackfeet Tribe should not be allowed to hunt in any portion of the Park under any circumstances. Despite Congress's failure to refer to treaty rights explicitly, it is clear that Congress intended to create a game preserve in Glacier Park where the Secretary of the Interior was not authorized to allow any hunting. Because Congress abrogated the Tribe's right to hunt in the ceded lands, the Indictment accurately states an offense against the laws of the United States. Defendant Peterson's motion to dismiss and his Rule 29 motion for a Judgment of Acquittal must be denied.

Accordingly, IT IS HEREBY ORDERED that the motion to dismiss (dkt # 12) is DENIED.

IT IS FURTHER ORDERED that Peterson's Rule 29 motion is DENIED.

IT IS FURTHER ORDERED that the Clerk of Court shall serve this Order upon

---

14. The United States argues that the Department of the Interior has always perceived Glacier National Park to be off-limits to all hunting and that its interpretation is entitled to "very great respect," citing *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985). However, the question in this case is what Congress intended at the time it created the Park. The Department of the Interior's interpretation of the enabling legislation does not go to that question.

both Defendants, the Amici, and upon the United States.