**Richard BRUNER, Jr. and Betty K. Bruner, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 02–CV–504–H(C).

United States District Court, N.D. Oklahoma.

Aug. 16, 2004.

James Rouse Hicks, Ronald Joseph Saffa, Reece Boone Morrel, Paul R. Hodgson, Morrel West Saffa Craige & Hicks Inc., Tulsa, OK, Arthur R. Miller, Cambridge, MA, for Plaintiffs.

Robert D. Metcalfe, Teresa Dondlinger Trissell, US Department of Justice Tax Division, Washington, DC, for Defendant.

## ORDER

HOLMES, Chief Judge.

This matter comes before the Court for a determination of whether a statute duly enacted by the United States Congress is enforceable under the Constitution of the United States. That statute, Section 3 of the Act of Congress dated May 10, 1928, 45 Stat. 495, provides in applicable part as follows:

> That all minerals, including oil and gas, produced on or after April 26, 1931, from restricted allotted lands of members of the Five Civilized Tribes in Okla-

homa, or from inherited restricted lands of full-blood Indian heirs or devisees of such lands, shall be subject to all State and Federal taxes of every kind and character the same as those produced from lands owned by other citizens of the state of Oklahoma.

Plaintiffs argue that this enactment constituted an uncompensated "taking" of property and therefore violated the due process rights granted by the Constitution. Defendant replies that the statute effects no such taking and is fully within the constitutional power of Congress to impose taxes.

At the hearing on June 6, 2003, Plaintiffs conceded that they cannot prevail in this lawsuit if Section 3 is constitutional. Therefore, after further briefing, the only question before the Court at this time is the constitutionality of this enactment. After an extensive review of the pertinent case authority, as discussed below, the Court finds the 1928 statute is constitutional.

## I. FACTUAL BACKGROUND

Solely for the purpose of resolving the instant question, the parties have stipulated to the following facts:

### A. Historical Background

1. The Creeks, at the time of the establishment of the United States Government, inhabited a territory in the southeastern United States.

2. During the period 1826 through 1840, the Creek Indians, some voluntarily and some forcibly, left their homes in the east and relocated in Indian Territory (in what is now the State of Oklahoma). Pursuant to a treaty dated February 14, 1833, the Creek Nation acquired a patent awarding the Nation fee simple title to a part of the Indian Territory. Over time, the white population in Indian Territory outnumbered the Indian population.

3. After the Civil War, the United States Government pursued a policy of dissolution of the Five Civilized Tribes, including the Creek Nation, and the creation of a state in what was then Indian Territory.

4. Representatives of the Dawes Commission met with the Five Civilized Tribes with the dual goals of allotment of the land to the individual Indian members and the abolishment of tribal governments. The Dawes Commission found that a majority of the Indians were hostile to the proposed allotment of their land and the abolishment of their tribal governments. From 1893 to 1897, the Dawes Commission made fruitless efforts to conclude allotment agreements. Congress threatened to enact laws for compulsory allotment if the tribes did not voluntarily ratify allotment agreements.

5. In 1897, the Dawes Commission submitted a proposed agreement to the Creeks for ratification. Both the Chief and the National Council rejected the Agreement of September 27, 1897.

6. It was under these conditions that Congress passed the Act of June 28, 1898, commonly called the Curtis Act.

7. In an election held on November 1, 1898, the Creek Nation rejected an amended version of the September 27, 1897 Agreement which had been included as Section 30 of the Curtis Act. As a result of the Tribe's failure to ratify the Agreement of September 27, 1897, the Curtis Act of June 28, 1898, became operative in the Creek Nation on December 1, 1898.

### B. The Bruners' Allotment

8. Miller Bruner was a full-blood male Creek Indian enrolled at Roll No. 4893, on February 3, 1900, and was 22 years of age.

9. Miller Bruner died intestate on May 15, 1903.

10. By an Allotment Deed and a Homestead Deed both dated September 25, 1903 and approved by the Department of Interior on October 23, 1903, Miller Bruner was allotted the SW Quarter of Section Twenty-one (21), Township Eight (8) North, Range Nine (9) East, Hughes County, Oklahoma ("the Property").

11. Dick Bruner, plaintiff Richard Bruner's father and also a full-blood Creek Indian, inherited the Property subject to a life estate held by his mother. This life estate was later conveyed to Dick Bruner and the conveyance approved by the County Court of Hughes County.

12. Dick Bruner died intestate on September 19, 1981. Each of his three sons— Rudolph Bruner, Randolph Bruner, and plaintiff Richard Bruner, Jr.—received a one-third (1/3) share in the Property.

13. Plaintiffs Richard Bruner, Jr. and Betty K. Bruner, husband and wife, are citizens of the United States of America and are residents of Claremore, Oklahoma.

14. Plaintiff Betty K. Bruner is Richard Bruner, Jr.'s wife, but is not a restricted Indian. Mrs. Bruner is also a plaintiff because she filed federal income tax returns for the years 1984, 1985, and 1991 through 1995 jointly with Mr. Bruner.

C. The Oil and Gas Lease and Income

15. The three brothers, Rudolph, Randolph, and plaintiff, Richard, entered into an oil and gas lease with Melzer Exploration Company on March 16, 1983, covering the Southwest Quarter of Section 21–8N–9E, Hughes County, Oklahoma. The leasing parties entered into an addendum on June 17, 1983. The lease and the addendum were both approved by the District Court of Hughes County, Oklahoma on June 17, 1983, at which the United States Probate Attorney appeared.

16. Richard Bruner, Jr. was paid in open court his share of bonus money from the oil and gas lease on the Property after approval of the lease by the state court.

17. Plaintiff Richard Bruner, Jr. received income from the production of oil and gas on this restricted Indian land and included this income in Plaintiffs' taxable income on their federal income tax returns for the years 1984, 1985, and 1991 through 1995.

D. Plaintiffs' Federal Income Tax Returns and Claims for Refund

18. Plaintiffs' tax returns were filed, their taxes paid, and their claims for refund were filed with the IRS on the following dates:

| Tax Year | Returned Filed | Latest Tax Payment | Claim Filed |
|---|---|---|---|
| 1984 | 8/19/85 | 1/15/85 | 4/14/98 |
| 1985 | 5/15/87 | 4/15/86 | 4/14/98 |
| 1991 | 8/18/92 | 3/26/93 | 4/14/98 |
| 1992 | 8/17/93 | 4/28/95 | 4/14/98 |
| 1993 | 8/17/94 | 9/2/95 | 4/14/98 |
| 1994 | 4/15/95 | 1/30/96 | 4/14/98 |
| 1995 | 4/15/95 | 11/5/97 | 4/14/98 |

19. Plaintiffs paid the following amounts of federal income tax, as reported due on their returns:

| Year | Net Income Therefrom | Federal Income Tax Paid |
|---|---|---|
| 1984 | $157,898 | $18,987 |
| 1985 | 194,173 | 22,784 |
| 1991 | 20,388 | 1,849 |
| 1992 | 13,366 | 1,523 |
| 1993 | 10,582 | 2,229 |
| 1994 | 7,699 | 2,151 |
| 1995 | 6,072 | 1,888 |
| TOTAL | $410,178 | $51,411 |

20. Plaintiffs request a refund of $44,325 of federal income taxes paid on net income attributable to oil and gas production from the SW Quarter of Section 21–8N–9E as follows:

| Year | Refund |
|---|---|
| 1984 | $18,987 |
| 1985 | 20,662 |
| 1991 | 409 |
| 1992 | 596 |

| | |
|---|---|
| 1993 | 1,608 |
| 1994 | 1,155 |
| 1995 | 908 |
| TOTAL | $44,325 |

21. By letter dated November 1, 2000, the Internal Revenue Service disallowed all of Plaintiffs' claims for federal income tax refunds and none have been refunded.

### E. Additional Facts

22. No state court guardian has been appointed for Richard Bruner, Jr.

23. Richard Bruner, Jr. signs his own contracts except for contracts pertaining to restricted Indian land, which must be approved by the state district court.

24. Plaintiffs filed their own federal income tax returns for the years at issue; the Bureau of Indian Affairs did not prepare or file tax returns for Plaintiffs for those years.

25. Richard Bruner, Jr. signed his Forms 1040x, Amended U.S. Individual Income Tax Return, for the years at issue; these forms were not prepared by the Bureau of Indian Affairs.

## II. LEGAL BACKGROUND

The Court finds that a review of the relevant legal authorities in this area is instructive.

### A. Introduction

The federal-tribal relationship, premised upon broad but not unlimited federal constitutional power over Indian affairs, often is described as "plenary." This relationship also is characterized by special trust obligations, which require the United States to adhere strictly to fiduciary standards in its dealings with the Indians. The tension inherent between this broad federal authority and the special trust obligations has resulted in a unique body of law. *Felix S. Cohen's Handbook of Federal Indian Law* 207 (1982) (hereinafter Cohen).

This same 1982 edition of Cohen indicates that, at least up to that time, "[n]o case ha[d] been found holding a federal tax law unconstitutional as applied to Indians or tribes." Cohen at 390 n. 4. According to *Chickasaw Nation v. United States*, 208 F.3d 871, 880 (10th Cir.2000), *aff'd*, 534 U.S. 84, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001), "[a]lthough Congress has often refrained from imposing taxes on Indian tribes, the Supreme Court has never held unconstitutional a federal tax applied to Indians."

This area of the law is not free from doubt. As one scholar noted, there are so many federal and state laws concerning Oklahoma Indians that "practically speaking it is no wonder that confusion exists over what the law states." Kirke Kickingbird, *"Way Down Yonder in the Indian Nations, Rode My Pony Cross the Reservation!" from "Oklahoma Hills" by Woody Guthrie*, 29 Tulsa L.J. 303, 304 (1993). Kickingbird added that "it is quite possible that no one is clear on what the law is." *Id.* at 324. Significantly, he noted that "statutes and court decisions which attempt to sift through the confusion tend to reflect the federal Indian policy at the time of the decision rather than a strict interpretation of the law, thus causing a general inconsistency in the treatment of the subject matter." *Id.* at 324–25. As an example of such confusion on the part of Congress, he cites the Act of May 24, 1928, 45 Stat. 733, which amended section 4 of the instant statute just two weeks following its enactment. *Id.* at 325 n. 92.

This case involves the constitutionality of a federal law that authorizes the State of Oklahoma to tax oil and gas production on restricted Indian land. Express authorization by the United States Government is a prerequisite for a state to impose a tax. "Whether a state is empowered to tax Indians and Indian-related

activities depends on an analysis of conflicting sovereign rights. Congressional authorization to tax is an overriding factor in determining if a state tax is valid." William S. Dockins, Comment, *Limitations on State Power to Tax Natural Resource Development on Indian Reservations*, 43 Mont. L.Rev. 217, 218 (1982). Congress, with its plenary power to deal with the tribes, may be able to empower the state to do this. *Id.* at 219.

▇▇ It is settled law that "Congress is invested with a wide discretion, and its action, unless purely arbitrary, must be accepted and given full effect by the courts." Cohen at 214, quoting *Perrin v. United States*, 232 U.S. 478, 486, 34 S.Ct. 387, 58 L.Ed. 691 (1914). Cohen states that the Fifth Amendment limits the taxing power in certain instances, but that federal power to tax Indians and tribes is usually clear. Cohen at 390. He states further that "federal tax laws are assumed not to intend to infringe on the rights of Indians under treaties and Indian legislation, absent clear congressional intent to the contrary," so that the application of federal tax laws to Indians customarily involves interpreting the purposes behind applicable treaties, Indian laws, and tax laws. Cohen at 390.

As the Court observed previously, the Supreme Court decisions in this area appear to reflect the prevailing Indian policy of the day. The statute at issue here was enacted during a period in which Congress passed several statutes enabling states to tax gross mineral production on restricted Indian lands. Cohen at 421. Cohen suggests that their "dominant purpose may have been to overcome the immunity of non-Indian lessees," even though they applied to Indian royalty interests. Cohen at 422. Notably, the Supreme Court has indicated that this was not their purpose at all:

[S]everal congressional enactments permit Oklahoma to impose a gross production tax on minerals produced from the lands of the Osages, the Kaws, the Quapaws, and the Five Civilized Tribes, and authorize payment of taxes due on account of the Indians' royalty interest. But Congress' purpose in enacting these statutes was the removal of the immunities of the Indians themselves .... The resulting removal of the immunity of private lessees of those Indian lands was an incidental effect of this legislation. *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 366–67, 69 S.Ct. 561, 93 L.Ed. 721 (1949).

### B. Case Law

The United States Supreme Court, federal appellate courts, and the Supreme Court of Oklahoma have each addressed related issues. These cases inform the instant question.

In *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912), Choctaw and Chickasaw patents under the Atoka Agreement were determined to be "in the form of a contract," and therefore conferred rights that could not be taken away without due process. *Id.* at 671, 32 S.Ct. 565. Restrictions on alienation could be removed, but the tribe members had a right to the tax exemption promised for a certain period of years (21). *Id.* at 673, 32 S.Ct. 565. This case is inapposite, however, because this attempt to curtail the exemption occurred before the expiration of the established period of time.

In *English v. Richardson*, 224 U.S. 680, 32 S.Ct. 571, 56 L.Ed. 949 (1912), decided the same day as *Choate*, a Creek plaintiff was granted a tax exemption following the reasoning in *Choate*. No material distinction is made between the situation of the Choctaws and Chickasaws versus that of the Creeks. *Id.* at 681, 32 S.Ct. 571. No-

tably, however, this was inside the 21–year time period.

In *Woodward v. De Graffenried*, 238 U.S. 284, 35 S.Ct. 764, 59 L.Ed. 1310 (1915), the Supreme Court discussed in detail the history of the Creeks with regard to the allotment process. A Creek freedwoman died after selecting her allotment but before the Original Creek Agreement, so she took under Section 11 of the Curtis Act. Her allotment was subsequently confirmed by Section 6 of that Agreement. This was an ejectment suit, and the question was what law applied to determine her heirs. *Id.* at 287–88, 35 S.Ct. 764.

According to the Supreme Court, Section 11 conveyed only the exclusive right to the surface of the land during the allottee's lifetime, a "mere temporary or provisional allotment." *Id.* at 292, 307, 35 S.Ct. 764. The Curtis Act was attempting to administer the trusts imposed on the tribes by early treaties, and did not purport to disturb tribal title to the allotted land. *Id.* at 305, 35 S.Ct. 764. The Original Creek Agreement accepted and confirmed the allotment work already accomplished by the Dawes Commission, and with the same effect as if it had been done after ratifying the agreement. *Id.* at 313, 35 S.Ct. 764. The Court saw no evidence of a design to put the Curtis Act allotments on any different basis, in any respect, from allotments made after the Agreement, "if not inconsistent with the provisions of the Agreement." *Id.* at 314, 35 S.Ct. 764. The Curtis Act allotments, which had been "tentative and provisional," became "final and conclusive" by virtue of the Agreement. *Id.* at 318, 35 S.Ct. 764.

In *Marlin v. Lewallen*, 276 U.S. 58, 48 S.Ct. 248, 72 L.Ed. 467 (1928), the Court considered a claim to an estate by the curtesy in lands allotted to a Creek woman, stating with respect to the Creek Agreements: "It is apparent from the terms and scope of the agreements that they were in the nature of a comprehensive treaty rather than a mere supplement to the fragmentary legislation which preceded them; and it is apparent from their repealing provisions ... that they were to have full effect regardless of any inconsistency with that legislation." *Marlin*, 276 U.S. at 63, 48 S.Ct. 248. They were "negotiated and put in force as special laws for the Creeks ... and their provisions ... were such that the Indians naturally would regard them as complete in themselves and not affected by other laws not brought into them by distinct reference." *Id.* at 65, 48 S.Ct. 248.

In *Carpenter v. Shaw*, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930), the Court addressed an action involving Choctaws and the Atoka Agreement. The Court construed the Act of May 10, 1928 in the context of that agreement, and refused to restrict its limited tax exemption to land or real estate taxes. *Id.* at 367, 50 S.Ct. 121. It liberally construed the tax on royalty interests, not as one on the severed oil and gas, but "upon the right reserved in them as lessors and owners of the fee." *Id.* at 368, 50 S.Ct. 121. It is noteworthy, however, that the 21–year period of exemption had not expired.

In *Carter Oil Co. v. Oklahoma Tax Comm'n*, 166 Okla. 1, 25 P.2d 1092 (1933), the Oklahoma Supreme Court addressed whether a grantee of a Seminole tribe member would be exempt from paying the gross production tax. The opinion concluded that an unambiguous act of Congress provided the requisite evidence of the federal government's consent to the imposition of a state tax on a federal instrumentality. *Id.* at 1094. No vested property rights were involved, as the plaintiff here was the oil company grantee. The Supreme Court of Oklahoma concluded that Congress was acting within its

power when it passed the Act of May 10, 1928. *Id.* at 1096.

The case of *Superintendent of Five Civilized Tribes v. Comm'r of Internal Revenue*, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935), involved income from invested funds of a Creek Indian, which the Supreme Court said was the type of income contemplated by the general terms of the tax act. *Id.* at 420, 55 S.Ct. 820. Looking to the Original and Supplemental Creek Agreements (as well as 1906 and 1908 acts extending the period of restriction) for guidance, the Court found no such exemption and was not inclined to infer one for this type of income. *Superintendent,* 295 U.S. at 420–21, 55 S.Ct. 820.

*Oklahoma Tax Comm'n v. Texas Co.,* 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949), concerned non-Indian lessees of mineral rights in allotted and restricted lands in Oklahoma who were deemed not immunized against payment of the state gross production and excise taxes on petroleum produced from the lands. The allotments were under the General Allotment Act (GAA). The Supreme Court stated that Congress does have the power to immunize the lessees from such taxes, that in the absence of Congressional action "we think the Constitution permits Oklahoma to impose." *Id.* at 365, 69 S.Ct. 561. They proceeded to enumerate the Congressional statutes permitting Oklahoma to impose a gross production tax on minerals, including the instant statute. *Id.* at 366 n. 42, 69 S.Ct. 561. The Court indicated that immunity was removed from the Indians, and declined to infer immunity "from mere congressional silence." *Id.* at 366–67, 69 S.Ct. 561.

*Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), addressed whether the proceeds of the sale of timber by the federal government on lands allotted under the General Allotment Act could be made subject to capital gains tax. The Supreme Court focused on several "relatively contemporaneous official and unofficial writings" in concluding that the proceeds were not taxable. *Id.* at 9–10, 76 S.Ct. 611. The rationale included the knowledge that the value of the land was in its timber, and "[o]nce logged off, the land is of little value." *Id.* at 10, 76 S.Ct. 611. It would thwart the purpose of the tax exemption in the GAA, and "[i]t is unreasonable to infer that, in enacting the income tax law, Congress intended to limit or undermine the Government's undertaking." *Id.*[1] In addition, the Court expressed the view that the language of an amendment to the GAA clearly indicated Congress's intent that an allotment was to be "free from all taxes, both those in being and those which might in the future be enacted", until the final patent issued. *Squire,* 351 U.S. at 8, 76 S.Ct. 611. The language at issue was that the Secretary of the Interior, when satisfied that the Indian allottee was competent to handle his or her affairs, would issue "a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed." *Id.* at 7, 76 S.Ct. 611.

In *United States v. Daney,* 370 F.2d 791 (10th Cir.1966), the Tenth Circuit construed Section 3 of the Act of May 10, 1928 in an action involving a Choctaw attempting to recover income taxes paid on a lease bonus. In examining the Act's legislative history, the *Daney* court found that the

---

1. Two scholars have advanced the view that a different outcome might have resulted if the income was recurring in nature, and not derived from a wasting enterprise such as timber harvesting, as the income would not represent "the loss, destruction or even diminution of the value of the land." Terry Noble Fiske & Robert F. Wilson, *Federal Taxation of Indian Income from Restricted Indian Lands,* X Land & Water L.Rev. 63, 80–81 (1975).

main purpose of Section 3 was to enable Oklahoma to collect a gross production tax on oil and gas produced on restricted Indian land. *Id.* at 794. The Court declined to extend a tax on production to a lease bonus or advance royalty:

> The language of the statute purports to put Indians and other citizens of Oklahoma on equal footing only as regards minerals *produced.* The Indians still enjoy the special tax advantage as to other income from the allotted, restricted lands. That advantage must be preserved to carry out the Congressional purpose behind the allotment system.

*Id.* at 795 (emphasis in original).

*Clark v. United States,* 587 F.2d 465 (10th Cir.1978), involved a noncompetent, restricted Chickasaw's request for refund of taxes paid from her trust account. The question was whether the oil and gas cash bonus and delay rentals were subject to federal income tax as advance royalty, when actual production followed such payment. *Id.* at 466. The *Clark* court decided to follow its earlier opinion in *Daney,* observing that nothing in the legislative history of the Act of May 10, 1928 mentioned federal taxes, only the Oklahoma gross production tax. *Id.* at 468. The court was "not convinced that Congress clearly intended to remove this tax exemption, in view of the strong public policy to favor the Indians in matters of construction of these Acts." *Clark,* 587 F.2d at 468.

*Chickasaw Nation v. United States,* 534 U.S. 84, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001), which concerned a possible exemption in the Indian Gaming Regulatory Act, contains an extended discussion of conflicting canons of construction, finding that the canon that assumes Congress intends statutes to benefit the tribes is offset by the canon that warns against implied tax exemptions. *Id.* at 95, 122 S.Ct. 528. The Supreme Court declined to concede that the former canon is controlling, "particu-

larly where the interpretation of a congressional statute rather than an Indian treaty is at issue .... This Court's earlier cases are too individualized, involving too many different kinds of legal circumstances, to warrant any such assessment about the two canons' relative strength." *Id.*

### C. Legislative History and Other Contemporaneous Documents

An early Attorney General opinion regarding income from restricted lands of the Quapaws, which predates the statute at issue here (thus Congress presumably was aware of it), stated that to make the restriction on alienation effective, "it would seem that inalienability and nontaxability should go hand in hand, at least until Congress clearly provides otherwise." 34 Op. Att'y Gen. 439, 445 (1925), *overruled by* 39 Op. Atty. Gen. 107 (1937). An even earlier Attorney General opinion, concerning taxability of income received by individual members of the Five Civilized Tribes from tax-exempt lands, maintained that when Congress removed restrictions against alienability, it did not follow that the exemptions from taxation also were removed. 34 Op. Att'y Gen. 275 (1924), *reprinted as* T.D. 3570, 1924 III-1 C.B. 85, 89. The Indians' patents gave them "as good a title to the exemption as it did to the land itself." *Id.* (quoting *Choate,* 224 U.S. at 674, 32 S.Ct. 565). Such exemptions became vested rights, and during the period of tax exemption specified, income received from the land also was immune. *Id.* at 91.

Language contained in contemporaneous statutes, and related legislative history, confirms a desire by Congress to consider specially taxes on oil production. John Collier, Commissioner of the Bureau of Indian Affairs, wrote in the *Washington Post* on May 6, 1934, prior to introducing a

redrafted version of the Indian Reorganization Act, ch. 576, § 2, 48 Stat. 984 (1934), extending the trust period indefinitely, that the Act assures the Indians that they will not owe taxes on their land. However, this did not mean that "Indians who produce commodities on which they make a substantial income w[ould] not have to pay taxes on that income," quoted in Patrick Putzi, *Indians and Federal Income Taxation*, 2 N.M. L.Rev. 200, 218 n. 96 (1972). The Oklahoma Indian Welfare Act, ch. 831, 49 Stat. 1967 (1936) (codified at 25 U.S.C. § 501 (2000)), provides that while the lands are held in trust by the United States, they will be "free from any and all taxes," with the exception of the gross production tax on oil that the state is authorized to levy.

Reports accompanying the legislation at issue here are not instructive. The reports issued by both the U.S. House of Representatives and the U.S. Senate are in all substantive respects virtually identical, comprising predominantly a letter from Secretary of the Interior, Hubert Work. With regard to Section 3 of the Act of May 10, 1928, he stated as follows:

> While keeping in mind the interests of the restricted Indians of the Five Civilized Tribes, it is believed that if the period of restrictions on their lands be extended as contemplated in the proposed bill, they should not continue to be exempt from taxation, except as to a limited acreage of their land. It is further believed that the taxation provisions of sections 3 and 4 of the proposed bill are not only fair and just to the State of Oklahoma, but to the Indians as well.

H.R.Rep. No. 70–1193, at 5 (1928).

More instructive is the September 22, 1931 opinion with respect to the Act of 1928 of E.C. Finney, Solicitor of the Department of the Interior, found in 53 Interior Dec. 502 (1931). The Secretary of the Interior requested his opinion on whether Oklahoma had the right to tax the royalty interests of the Five Civilized Tribe members on oil and gas produced on their restricted lands under section 3 of the Act of May 10, 1928. Finney asserted that the section is free from ambiguity, "[b]earing in mind, however, that it is beyond the power even of Congress to invade or impair vested rights," and that it is important "in determining whether the statute is effective to accomplish its plainly expressed purpose, to consider the rights of these Indians with regard to the taxability of their lands under prior legislation and treaties negotiated with them." 53 Interior Dec. at 503.

Finney divided the lands involved into two distinct classes: those to which tax exemption had attached by express provisions of allotment agreements, and those to which the tax exemption attached as an incident of the restrictions against alienation. The first class encompassed those lands covered by the Choctaw and Chickasaw agreement, also known as the Atoka Agreement, and discussed in *Choate*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941. That grant of nontaxable land conferred property rights protected by the Fifth Amendment, and was not subject to subsequent repeal or impairment by Congress. 53 Interior Dec. at 504. These lands, in his opinion, remained exempt from taxation during the period provided for in the allotment agreements, despite Section 3 of the 1928 Act. *Id.* at 506.

On the other hand, the restrictions against alienation of the second group "did not constitute a vested property right but were in the nature of personal disabilities to be continued or dropped at the will of Congress." *Id.* at 506. Therefore, Finney concluded that "[i]n so far as the lands to which no vested right of immunity from taxation has attached are concerned, the

legislation providing for the tax invaded no right of the Indians and was unquestionably a proper exercise of the plenary power possessed by Congress over the subject matter," notwithstanding that the legislation was a departure from its usual practice of tying tax exemption to restricted status. *Id.* Finney reconciled sections 3 and 4 of the 1928 legislation, by concluding that even the homestead would be subject to the gross production tax after April 26, 1931. *Id.* at 508.

### III. EXISTENCE OF A VESTED RIGHT

Based upon a review of the above-referenced authorities, the question becomes whether Plaintiffs have a vested right to an exemption from taxation. According to Cohen, the Fifth Amendment protection pertains only to Indian property rights "recognized by Congress." Cohen at 217 n. 5. Section 11 of the Curtis Act, or Act of June 28, 1898, 30 Stat. 495, 498, provides that restricted Indian land "shall be nontaxable while so held." Plaintiff's grandfather took his allotment under this Act in 1900. Plaintiffs assert that it is irrelevant that the Curtis Act was not written in the formal language of contract (Plaintiff's Memorandum of Constitutionality at 7), but parts of it most certainly were. The Atoka Agreement was embodied in Section 29 of the statute, and the contemplated (but never ratified) agreement with the Creeks in Section 30. Based on a careful review of the language, the Court finds that the provisions of Section 11, ("when the roll of citizenship . . . is fully completed . . ., and the survey of the lands . . . is also completed, the commission . . . shall proceed to allot the exclusive use and occupancy of the surface of all the lands . . .," 30 Stat. 497), cannot be construed as a contract granting vested rights.

Subsequently, the Act of March 1, 1901, 31 Stat. 861 (Original Creek Agreement),

was enacted by Congress, an "Act to ratify and confirm an agreement with the Muscogee or Creek tribe of Indians, and for other purposes." *Id.* The language indicates that Chapter 676 is accepting, ratifying, and confirming an agreement negotiated the year before between the Commission to the Five Civilized Tribes and the Creek tribe. *Id.* This agreement, *inter alia,* covered the allotment to each enrolled citizen of 160 acres of land, and in Section 6 it stipulated that "[a]ll allotments made to Creek citizens by said commission prior to the ratification of this agreement . . . are confirmed, and the same shall, as to appraisement and all things else, be governed by the provisions of this agreement." *Id.* at 863. Section 7 provided that lands were inalienable for five years, and homesteads of forty acres carved from the allotments "shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years." 31 Stat. 863.

The following year, the Act of June 30, 1902, 32 Stat. 500 (Supplemental Creek Agreement), modified the original agreement. This act purported to ratify and confirm a supplemental agreement with the Creek tribe, and the language "in consideration of the mutual undertakings herein contained it is agreed" clearly sounds in contract. *Id.* Some sections of this agreement contained language indicating that the section as contained in the original agreement was amended and "as so amended is reenacted to read as follows." (*See, e.g.,* Sections 2 and 3.) Other provisions were repealed (*see, e.g.,* Sections 6 and 15, repealing one part of earlier section 7 and all of prior section 24, respectively.) The remainder of the language supplemented the original agreement, which remained in effect. There is nothing, however, to supplant the language in original Section 6, quoted above. The language in original Section 7, also quoted

*supra,* was paraphrased in Section 16 with some minor changes, but the entire allotment still was restricted for five years, and the forty-acre homestead remained "nontaxable, inalienable, and free from any incumbrance whatever" for 21 years. *Id.* at 503.

Cohen maintains that the Supreme Court repeatedly has confirmed that Congress may abrogate a treaty provision unilaterally, but goes on to say that "special rules concerning construction of Indian treaties ... create a strong presumption that treaty rights have not been abrogated or modified by subsequent congressional enactments." Cohen at 222. Congress must demonstrate a "clear and plain" intent to abrogate treaty rights, either in the language of the statute itself or in its legislative history. *Id.* at 223. Here, we are dealing with agreements (original and supplemental) that were fashioned after 1871 (when the practice of making treaties with the tribes was discontinued by Congress). However, history and common sense compel the conclusion that "[t]he principle of a 'clear and plain statement' before Indian treaty rights can be abrogated also applied in nontreaty contexts." Cohen at 224.

Although the federal government considers itself guardian of the Indian ward, "there is no superior authority to whom this particular guardian may be compelled to account, and the dealings of our government with its Indian wards have not infrequently amounted to what in the case of an ordinary guardian would be both legally and morally a gross breach of trust." Robert C. Brown, *The Taxation of Indian Property,* 15 Minn. L.Rev. 182, 184 (1930–31). What protects the Indians against state or federal government action is determined by Congress, with no explicit right of appeal to the courts, and "what Congress desires with respect to taxation or anything else it can almost invariably secure, any injustice to the states or to the Indians themselves to the contrary notwithstanding." *Id.* at 187. This contemplates a federal government with discretion over all taxation of Indians, who can be made subject to or exempt from state or local taxation as the federal government desires (unless there is a contract vesting them with protected rights). *Id.* at 208.

In the instant case, the language of the Agreements purports to cover comprehensively the entire agreement between the federal government and the Creek tribe. Indeed, the language does not mention a perpetual tax exemption, or suggest that restriction and tax exemption are to be tied together inexorably. Accordingly, this Court finds that no vested right has been granted here and, accordingly, no vested right has been abrogated. Instead, an exemption for a set period of time (a certain number of years, or as amended during the allottee's tenure, or both) is all that was established. Clearly, the Original Agreement neglected to carry forward the prospective tax exemption language embodied in Section 11 of the Curtis Act. Moreover, the Supreme Court and other courts have had ample opportunity over the last 76 years to consider the Act of May 10, 1928 and its amending acts, and no court has determined that the Constitution in any way prevents Congress from exercising its lawful authority to impose taxes in this area.

## IV. *CONCLUSIONS OF LAW*

Based upon a review of the above-referenced authorities and the briefs and arguments of counsel, the Court hereby enters the following Conclusions of Law.

### A. General Principles

1. The Sixteenth Amendment to the United States Constitution gives Congress the power to tax, without apportionment,

income "from whatever source derived." U.S. Const. amend. XVI.

2. Sections 1 and 11 of the Internal Revenue Code (the "Code") subject the income of every individual, estate, trust, and corporation to tax. 26 U.S.C. §§ 1, 11 (2000). Section 61(a) of the Code further provides that "[e]xcept as otherwise provided in this subtitle, gross income means all income from whatever source derived ..." 26 U.S.C. § 61(a) (2000).

3. The Supreme Court repeatedly has inferred from the sweeping language of Section 61(a) or its predecessor provisions that Congress intended to exert "the full measure of its taxing power." *HCSC— Laundry v. United States*, 450 U.S. 1, 5, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981); *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 429, 75 S.Ct. 473, 99 L.Ed. 483 (1955); *Helvering v. Clifford*, 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788 (1940).

■ 4. It is well settled that "[u]nder our system of federal income taxation, ... every element of gross income of a person, corporation, or individual is subject to tax unless there is a statute or some rule of law that exempts that person or element." *HCSC–Laundry*, 450 U.S. at 5, 101 S.Ct. 836.

■ 5. It also is settled law "that a general statute applying to all persons includes Indians and their property interests." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). Courts long have held that "Indians are citizens and that in the ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens." *Squire*, 351 U.S. at 6, 76 S.Ct. 611. *Accord Jourdain v. Comm'r*, 617 F.2d 507, 509 (8th Cir.1980); *Lazore v. Comm'r*, 11 F.3d 1180, 1183 (3rd Cir.1993); *United States v. Willie*, 941 F.2d 1384, 1400 (10th Cir.1991).

■ 6. A court is not free to construe a treaty or a statute as impliedly creating a tax exemption. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). The Supreme Court " 'has repeatedly said that tax exemptions are not granted by implication.... It has applied that rule to taxing acts affecting Indians as to all others.' " *Id.* (quoting *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598, 606–07, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943)). *Accord Dillon v. United States*, 792 F.2d 849, 853 (9th Cir.1986); *see Superintendent of Five Civilized Tribes*, 295 U.S. at 420, 55 S.Ct. 820 ("if [a tax] exemption exists it must derive plainly from agreements with the [Indians at issue] or some Act of Congress dealing with their affairs.")

■ 7. If Indians are to be granted an exemption from taxation, whether by treaty or statute, it must be clearly expressed. *Squire*, 351 U.S. at 6, 76 S.Ct. 611; *Mescalero Apache Tribe*, 411 U.S. at 156, 93 S.Ct. 1267; *see also Comm'r v. Walker*, 326 F.2d 261, 263 (9th Cir.1964) (as a general act of Congress applying to all persons, the Internal Revenue Code subjects Indians to the payment of federal income taxes "unless an exemption from taxation can be found in the language of a Treaty or Act of Congress"). An Indian claiming an exemption from federal income taxation must point to "express exemptive language in some statute or treaty." *United States v. Anderson*, 625 F.2d 910, 913, 917 (9th Cir.1980).

■ 8. Although one canon of Indian law states that ambiguous statutes and treaties are to be construed in favor of Indians, such statutes and treaties are not to be construed to grant tax exemptions unless they contain language which reasonably can be so construed. *Hoptowit v. Comm'r of Internal Revenue*, 709 F.2d 564, 565 (9th Cir.1983).

9. No interpretation of statutory language in favor of Plaintiffs is appropriate here. As discussed above, the canon of construction that warns against interpreting federal statutes to provide tax exemptions unless clearly expressed trumps the canon assuming that Congress intends its statutes to benefit the tribes. *Chickasaw Nation,* 534 U.S. at 95, 122 S.Ct. 528.

### B. Creek Nation

10. When a Creek Indian claims an exemption from tax based on his status as an Indian, the exemption must come from agreements between the United States and the Muskogee (Creek) Nation, or acts of Congress. *See Superintendent of the Five Civilized Tribes,* 295 U.S. at 420, 55 S.Ct. 820 (looking to the Creek agreement of 1901 and the Supplemental Agreement of 1902); *Marlin v. Lewallen,* 276 U.S. at 63, 48 S.Ct. 248 (1928).

11. The terms of the agreements between the United States and the Creek Nation are contained in the Original Creek Agreement of March 1, 1901 (31 Stat. 861) and Supplemental Agreement of June 30, 1902 (32 Stat. 500). *See also* Semple, *Oklahoma Indian Land Titles* § 21 at 23.

12. It is apparent from the terms and scope of these two agreements that they were in the nature of a comprehensive treaty rather than a mere supplement to the fragmentary legislation which preceded them; and it is apparent from their repealing provisions-section 41 of one and section 20 of the other-that they were to have full effect regardless of any inconsistency with that legislation. *See Marlin,* 276 U.S. at 63, 48 S.Ct. 248.

13. These agreements, along with the land patents under which Miller Bruner accepted his land, "must be construed together" to determine the offer terms under which Miller Bruner received his allotment. *See Choate,* 224 U.S. at 673–74, 32 S.Ct. 565 ("The patent and the legislation of Congress must be construed together ...").

14. The Original Creek Agreement of 1901 (31 Stat. 861) sets forth the specific terms under which Miller Bruner took title to the Property at issue in this suit. *See* Exhibits 1 and 2 to the Complaint.

15. Section 7 of this agreement provides that forty acres of every allotment shall be nontaxable and inalienable for twenty-one years. *See* 31 Stat. 861, 863 § 7.

16. Section 16 of the Supplemental Creek Agreement of 1902 (32 Stat. 500) similarly provides that each citizen shall select from his allotment forty acres which shall be and remain nontaxable for twenty-one years from the date of the deed. *See* 32 Stat. 500, 503 § 16.

17. As shown on Exhibit 2 to the Complaint, Miller Bruner selected a homestead of 40 acres of land from his 160 acre allotment. The Homestead Deed land patent specifically provides that the forty acres "shall be nontaxable and inalienable and free from any incumbrance whatever, for twenty-one years ...." *See* Exhibit 2 to the Complaint.

18. No language can be found in the Agreements, the Homestead Deed or the Allotment Deed making the land nontaxable so long as it is restricted.

19. Various acts of Congress extended the tax exemption on this Property beyond the 21 years provided in the Original and Supplemental Creek Agreements. *See, e.g.,* Act of Congress dated April 26, 1906 (the Curtis Act of 1906), 34 Stat. 137 (extending the tax-exempt status for 25 years, until April 26, 1931, as long as the title remained in the original allottee); Act of Congress dated May 10, 1928, 45 Stat. 495, (extending the tax-exempt status for an additional 25 years, until April 26, 1956).

20. The Act of Congress dated August 11, 1955, 69 Stat. 666, extended the restrictions on alienation for the owner's life. The Creek Indians gave no consideration in exchange for this extension.

21. None of these acts extended the tax exemption to the heir of Richard Bruner Sr. ("Dick Bruner"). Plaintiffs have pointed to no subsequent acts of Congress which extended to Dick's son, Richard Bruner, Jr., a tax exemption on lands that he is restricted from alienating.

22. Congress did not subject the minerals produced on the Property at issue to state and federal taxation until April 26, 1931, again by passage of the Act of Congress dated May 10, 1928 (45 Stat. 495). Section 3 of the 1928 Act provides in relevant part "That all minerals, including oil and gas, produced on or after April 26, 1931, from restricted allotted lands of members of the Five Civilized Tribes in Oklahoma, or from inherited restricted lands of full-blood Indian heirs or devisees of such lands, shall be subject to all State and Federal taxes of every kind and character the same as those produced from lands owned by other citizens of the state of Oklahoma...." Miller Bruner's deeds are dated October 22, 1903; twenty-one years from 1903 is 1924. Consequently, the 21–year tax exemption provided under the Original and Supplemental Creek Agreement language expired before Congress enacted section 3 of the 1928 Act.

C. Restriction vs. Exemption

23. Richard Bruner, Jr. is not entitled to hold the Property exempt from federal income taxes simply because he is restricted from alienating the Property. Under federal law, land restrictions and tax exemptions are discrete entities. They do not go hand in hand. *See Superintendent of the Five Civilized Tribes*, 295 U.S. at 420, 55 S.Ct. 820; *Oklahoma Tax Comm'n*, 319 U.S. at 598, 63 S.Ct. 1284. *See also Jones v. Taunah*, 186 F.2d 445, 446 (10th Cir.1951) ("[I]t is settled law that restrictions upon alienation and non-taxability under federal law are not necessarily synonymous. They are separate and distinct things."). Holding restricted land does not grant the holder an exemption from taxation. *See Superintendent of the Five Civilized Tribes*, 295 U.S. at 421, 55 S.Ct. 820 ("Non-taxability and restriction upon alienation are distinct things."); *Oklahoma Tax Comm'n*, 319 U.S. at 602, 63 S.Ct. 1284 ("We find ... that the restriction [upon alienation], without more, is not the equivalent of a congressional grant of estate tax immunity....") and 607 ("Nontaxability and restriction upon alienation are distinct things, and when Congress wants to require both non-alienability and nontaxability it can, as it has so often done, say so explicitly.") (citations omitted). *See also* Semple, § 487 at 354 ("The theory upon which restricted lands are held nontaxable does not apply after [May 10, 1928].)"

D. Curtis Act

24. Plaintiffs maintain that Miller Bruner accepted a patent for the Property under the Curtis Act of 1898 (30 Stat. 495). They argue that the pertinent language of section 11 ("That the lands allotted shall be nontransferable until after full title is acquired and shall be liable for no obligations contracted prior thereto by the allottee, and shall be nontaxable while so held") conveyed a right to Plaintiff Richard Bruner, Jr. to hold his land free from taxation as long as it is nontransferable. But accepting *arguendo* Plaintiffs' position that the allotment was taken under the Curtis Act of 1898 does not give Richard Bruner, Jr. a right to hold the Property at issue exempt from taxation. The U.S. Supreme Court has held that the only interest conveyed to Creek Indians by section 11 of the Curtis Act of 1898 is a life estate. *Woodward*, 238 U.S. at 292, 35 S.Ct. 764.

Therefore, tax exemption for Miller Bruner did not pass to his heirs.

### E. Due Process

25. The Fifth Amendment provides in part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

26. The purpose of the compensation guarantee is to prevent the Government from requiring a few to bear burdens that, in fairness, should be borne by the public as a whole. *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

27. To be unconstitutional under the due process clause, a taxing statute must be so arbitrary as to amount to a confiscation or a clear and gross inequity or injustice. 1 Mertens, *Law of Federal Income Taxation* § 4:12, at 4–22.

28. Section 3 of the 1928 Act was enacted to address concerns raised by members of Congress from Oklahoma over the amount of tax-exempt lands in the State of Oklahoma. *See* Semple, § 486 at 353.

29. Due to the economic position of the Oklahoma Indians from their mineral resources, Congress determined that the Indians of the Five Civilized Tribes could help pay for the Government services paid for out of tax revenues. *See* H.R. Rep. 1193, 70th Cong., 1st Sess. 5 (1928); S. Rep. 982, 70th Cong., 1st Sess. 5 (1928).

30. In order to state a claim for a taking, a claimant must establish that he or she was the owner of property and that some portion of the property was taken for a public purpose. *Pub. Water Supply Dist. No. 3 v. United States*, 133 Ct.Cl. 348, 135 F.Supp. 887, 890 (1955).

31. Only one possessing an ownership interest in the property at the time of the taking is entitled to receive the required compensation. *United States v.*

*Dow*, 357 U.S. 17, 20–21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958).

32. The complaint alleges that the "property" taken was "a vested property right exemption from federal and state taxation." *See* Complaint, ¶ 26. This claim fails for two reasons. First, as discussed above, Richard Bruner, Jr. has never held this land as tax-exempt. No treaty or federal law vests Plaintiffs with the right to a tax-exemption on this land. Second, even if the limited 21–year tax-exemption provided under the Creek treaties and extended by subsequent Acts of Congress could be interpreted to apply to the heirs of heirs of allottees, Plaintiffs cannot show that Richard owned this property at the time of the taking. The taking Plaintiffs allege occurred in 1928 with the passage of section 3 of the Act of May 10, 1928. *See* Complaint, ¶ 14. But Richard did not have an ownership interest in the Property until September 19, 1981, some 53 years later. *See* Complaint, ¶ 11. Since Richard did not own the Property at the time of the alleged taking, he is not entitled to compensation under the Fifth Amendment.

33. Even if this Court were to accept Plaintiffs' argument that the exemption from taxation goes hand-in-hand with the restrictions on alienation, (contrary to the holdings in *Superintendent of the Five Civilized Tribes*, 295 U.S. at 421, 55 S.Ct. 820, and *Oklahoma Tax Comm'n*, 319 U.S. at 602, 607, 63 S.Ct. 1284), Plaintiffs' argument must fail. While Richard Bruner, Jr. is restricted from alienating his land (at least until he obtains a certificate of competency), the tax at issue here is an income tax. Richard Bruner, Jr. is not restricted in any way from disposing of his income. His status does not dictate that this income must be exempt from taxation. *See Choteau v. Burnet*, 283 U.S. 691, 695–96, 51 S.Ct. 598, 75 L.Ed. 1353

(1931) (the claim that petitioner, a restricted Indian, was restricted with respect to the income from royalties of oil and gas leases must fail).

 34. Congress's elimination of a tax exemption does not require compensation under the Fifth Amendment. Acts of Congress are amendable and repealable at the will of Congress. *See Choate*, 224 U.S. at 671, 32 S.Ct. 565; *see also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 594, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (confirming that Congress can abrogate a statutory or even a treaty provision unilaterally without the consent of the tribe); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566, 23 S.Ct. 216, 47 L.Ed. 299 (1903); *Cohen* at 222. No property right in having tax-exempt property was created by the extension of the tax exemption beyond 21 years. Furthermore, "[t]he tax law is not a promise, and no taxpayer has a vested right to the treatment provided at any particular time by the Code." 1 Mertens, *Law of Federal Income Taxation* § 4:14, at 4–28, citing *United States v. Carlton*, 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994).

35. As noted above, nothing in the Original Creek Agreement, Supplemental Creek Agreement, Miller Bruner's Homestead Deed, or Miller Bruner's Allotment Deed precluded the Government from taxing the minerals produced on the Property at issue after April 26, 1931.

36. Section 3 of the 1928 Act is a valid exercise of the taxing powers that Congress has under the Constitution and the Internal Revenue Code. The enactment of section 3 is not a taking and does not offend Constitutional principles of due process.

### F. Equal Protection

 37. The due process clause of the Fifth Amendment provides that no person shall be "deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. This clause embodies the principles of equal protection. *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983).

 38. As to the principle of equal protection, classifications adopted by Congress may not be disturbed so long as they bear a rational relation to a legitimate governmental purpose. *Regan*, 461 U.S. at 547, 103 S.Ct. 1997. The rational basis standard is particularly deferential in the context of classifications made by tax laws. *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

 39. Tax legislation carries a "presumption of constitutionality" and legislatures have considerable latitude in creating classifications and distinctions in the tax statutes. *Regan*, 461 U.S. at 547, 103 S.Ct. 1997. The broad discretion that legislatures possess as to classification in the taxation arena has been recognized for a long time. *Madden v. Kentucky*, 309 U.S. 83, 87–88, 60 S.Ct. 406, 84 L.Ed. 590 (1940).

 40. A taxpayer may overcome the presumption of constitutionality "only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes." *Id.* at 88, 60 S.Ct. 406.

 41. Federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. *United States v. Antelope*, 430 U.S. 641, 645, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977). The unique legal status of Indian tribes under federal law permits the Federal Government to enact legislation singling out tribal Indians, and this legislation is not subject to strict scrutiny simply because it includes an Indian classification. *Washington v. Confederated Bands & Tribes of*

*Yakima Indian Nation,* 439 U.S. 463, 500–01, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979).

 42. There is no violation of the equal protection principles of the Constitution in Congress's decision to exempt from taxation certain kinds of income derived from restricted lands, while not exempting income received from the production of oil and gas from restricted lands. Congress has the authority under the Constitution to provide a benefit to a particular class of taxpayers without providing similar benefits to all other classes of taxpayer. *Regan,* 461 U.S. at 546–47, 103 S.Ct. 1997.

Based on the above, the Court finds the Act of 1928 is constitutional. As previously noted, Plaintiffs conceded at the hearing on June 6, 2003 that if the 1928 Act is constitutional, Defendant must prevail in this lawsuit. Accordingly, the parties are hereby ordered to prepare an agreed form of judgment in Defendant's favor and submit that judgment to the Court not later than two weeks from the file date of this Order.

IT IS SO ORDERED.